Summary
6/4/2018 2:52:05 PM

Differences exist between documents.

| | |
|---|---|
| **New Document:** | **Old Document:** |
| 16-111_new | 16-111 |
| 59 pages (335 KB) | 59 pages (328 KB) |
| 6/4/2018 2:51:59 PM | 6/4/2018 2:51:59 PM |
| Used to display results. | |

Get started: first change is on page 42.

No pages were deleted

**How to read this report**

**Highlight** indicates a change.
~~Deleted~~ indicates deleted content.
▲ indicates pages were changed.
⟷ indicates pages were moved.

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MASTERPIECE CAKESHOP, LTD., ET AL. *v.* COLORADO CIVIL RIGHTS COMMISSION ET AL.

### CERTIORARI TO THE COURT OF APPEALS OF COLORADO

No. 16–111.   Argued December 5, 2017—Decided June 4, 2018

Masterpiece Cakeshop, Ltd., is a Colorado bakery owned and operated by Jack Phillips, an expert baker and devout Christian.  In 2012 he told a same-sex couple that he would not create a cake for their wedding celebration because of his religious opposition to same-sex marriages—marriages that Colorado did not then recognize—but that he would sell them other baked goods, *e.g.,* birthday cakes.  The couple filed a charge with the Colorado Civil Rights Commission (Commission) pursuant to the Colorado Anti-Discrimination Act (CADA), which prohibits, as relevant here, discrimination based on sexual orientation in a "place of business engaged in any sales to the public and any place offering services . . . to the public."  Under CADA's administrative review system, the Colorado Civil Rights Division first found probable cause for a violation and referred the case to the Commission.  The Commission then referred the case for a formal hearing before a state Administrative Law Judge (ALJ), who ruled in the couple's favor.  In so doing, the ALJ rejected Phillips' First Amendment claims: that requiring him to create a cake for a same-sex wedding would violate his right to free speech by compelling him to exercise his artistic talents to express a message with which he disagreed and would violate his right to the free exercise of religion.  Both the Commission and the Colorado Court of Appeals affirmed.

*Held*: The Commission's actions in this case violated the Free Exercise Clause.  Pp. 9–18.

   (a) The laws and the Constitution can, and in some instances must, protect gay persons and gay couples in the exercise of their civil rights, but religious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression. See *Obergefell* v. *Hodges*, 576 U. S. ___, ___.  While it is unexceptional

that Colorado law can protect gay persons in acquiring products and
services on the same terms and conditions as are offered to other
members of the public, the law must be applied in a manner that is
neutral toward religion.  To Phillips, his claim that using his artistic
skills to make an expressive statement, a wedding endorsement in
his own voice and of his own creation, has a significant First
Amendment speech component and implicates his deep and sincere
religious beliefs.  His dilemma was understandable in 2012, which
was before Colorado recognized the validity of gay marriages per-
formed in the State and before this Court issued *United States* v.
*Windsor*, 570 U. S. 744, or *Obergefell*.  Given the State's position at
the time, there is some force to Phillips' argument that he was not
unreasonable in deeming his decision lawful.  State law at the time
also afforded storekeepers some latitude to decline to create specific
messages they considered offensive.  Indeed, while the instant en-
forcement proceedings were pending, the State Civil Rights Division
concluded in at least three cases that a baker acted lawfully in declin-
ing to create cakes with decorations that demeaned gay persons or
gay marriages.  Phillips too was entitled to a neutral and respectful
consideration of his claims in all the circumstances of the case.
Pp. 9–12.

   (b) That consideration was compromised, however, by the Commis-
sion's treatment of Phillips' case, which showed elements of a clear
and impermissible hostility toward the sincere religious beliefs moti-
vating his objection.  As the record shows, some of the commissioners
at the Commission's formal, public hearings endorsed the view that
religious beliefs cannot legitimately be carried into the public sphere
or commercial domain, disparaged Phillips' faith as despicable and
characterized it as merely rhetorical, and compared his invocation of
his sincerely held religious beliefs to defenses of slavery and the Hol-
ocaust.  No commissioners objected to the comments.  Nor were they
mentioned in the later state-court ruling or disavowed in the briefs
filed here.  The comments thus cast doubt on the fairness and impar-
tiality of the Commission's adjudication of Phillips' case.

   Another indication of hostility is the different treatment of Phillips'
case and the cases of other bakers with objections to anti-gay mes-
sages who prevailed before the Commission.  The Commission ruled
against Phillips in part on the theory that any message on the re-
quested wedding cake would be attributed to the customer, not to the
baker.  Yet the Division did not address this point in any of the cases
involving requests for cakes depicting anti-gay marriage symbolism.
The Division also considered that each bakery was willing to sell oth-
er products to the prospective customers, but the Commission found
Phillips' willingness to do the same irrelevant.  The State Court of

Appeals' brief discussion of this disparity of treatment does not an-
swer Phillips' concern that the State's practice was to disfavor the re-
ligious basis of his objection. Pp. 12–16.

  (c) For these reasons, the Commission's treatment of Phillips' case
violated the State's duty under the First Amendment not to base laws
or regulations on hostility to a religion or religious viewpoint.  The
government, consistent with the Constitution's guarantee of free ex-
ercise, cannot impose regulations that are hostile to the religious be-
liefs of affected citizens and cannot act in a manner that passes
judgment upon or presupposes the illegitimacy of religious beliefs
and practices.  *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508
U. S. 520.  Factors relevant to the assessment of governmental neu-
trality include "the historical background of the decision under chal-
lenge, the specific series of events leading to the enactment or official
policy in question, and the legislative or administrative history, in-
cluding contemporaneous statements made by members of the deci-
sionmaking body."  *Id.*, at 540.  In view of these factors, the record
here demonstrates that the Commission's consideration of Phillips'
case was neither tolerant nor respectful of his religious beliefs.  The
Commission gave "every appearance," *id.*, at 545, of adjudicating his
religious objection based on a negative normative "evaluation of the
particular justification" for his objection and the religious grounds for
it, *id.*, at 537, but government has no role in expressing or even sug-
gesting whether the religious ground for Phillips' conscience-based
objection is legitimate or illegitimate.  The inference here is thus that
Phillips' religious objection was not considered with the neutrality
required by the Free Exercise Clause.  The State's interest could have
been weighed against Phillips' sincere religious objections in a way
consistent with the requisite religious neutrality that must be strictly
observed.  But the official expressions of hostility to religion in some
of the commissioners' comments were inconsistent with that re-
quirement, and the Commission's disparate consideration of Phillips'
case compared to the cases of the other bakers suggests the same.
Pp. 16–18.

370 P. 3d 272, reversed.

  KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and BREYER, ALITO, KAGAN, and GORSUCH, JJ., joined.  KAGAN, J.,
filed a concurring opinion, in which BREYER, J., joined.  GORSUCH, J.,
filed a concurring opinion, in which ALITO, J., joined.  THOMAS, J., filed
an opinion concurring in part and concurring in the judgment, in which
GORSUCH, J., joined.  GINSBURG, J., filed a dissenting opinion, in which
SOTOMAYOR, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–111

_____

## MASTERPIECE CAKESHOP, LTD., ET AL., PETITIONERS *v.* COLORADO CIVIL RIGHTS COMMISSION, ET AL.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF COLORADO

[June 4, 2018]

JUSTICE KENNEDY delivered the opinion of the Court.

In 2012 a same-sex couple visited Masterpiece Cakeshop, a bakery in Colorado, to make inquiries about ordering a cake for their wedding reception.  The shop's owner told the couple that he would not create a cake for their wedding because of his religious opposition to same-sex marriages—marriages the State of Colorado itself did not recognize at that time.  The couple filed a charge with the Colorado Civil Rights Commission alleging discrimination on the basis of sexual orientation in violation of the Colorado Anti-Discrimination Act.

The Commission determined that the shop's actions violated the Act and ruled in the couple's favor.  The Colorado state courts affirmed the ruling and its enforcement order, and this Court now must decide whether the Commission's order violated the Constitution.

The case presents difficult questions as to the proper reconciliation of at least two principles.  The first is the authority of a State and its governmental entities to protect the rights and dignity of gay persons who are, or wish to be, married but who face discrimination when they seek

goods or services. The second is the right of all persons to exercise fundamental freedoms under the First Amendment, as applied to the States through the Fourteenth Amendment.

The freedoms asserted here are both the freedom of speech and the free exercise of religion. The free speech aspect of this case is difficult, for few persons who have seen a beautiful wedding cake might have thought of its creation as an exercise of protected speech. This is an instructive example, however, of the proposition that the application of constitutional freedoms in new contexts can deepen our understanding of their meaning.

One of the difficulties in this case is that the parties disagree as to the extent of the baker's refusal to provide service. If a baker refused to design a special cake with words or images celebrating the marriage—for instance, a cake showing words with religious meaning—that might be different from a refusal to sell any cake at all. In defining whether a baker's creation can be protected, these details might make a difference.

The same difficulties arise in determining whether a baker has a valid free exercise claim. A baker's refusal to attend the wedding to ensure that the cake is cut the right way, or a refusal to put certain religious words or decorations on the cake, or even a refusal to sell a cake that has been baked for the public generally but includes certain religious words or symbols on it are just three examples of possibilities that seem all but endless.

Whatever the confluence of speech and free exercise principles might be in some cases, the Colorado Civil Rights Commission's consideration of this case was inconsistent with the State's obligation of religious neutrality. The reason and motive for the baker's refusal were based on his sincere religious beliefs and convictions. The Court's precedents make clear that the baker, in his capacity as the owner of a business serving the public, might

have his right to the free exercise of religion limited by generally applicable laws. Still, the delicate question of when the free exercise of his religion must yield to an otherwise valid exercise of state power needed to be determined in an adjudication in which religious hostility on the part of the State itself would not be a factor in the balance the State sought to reach. That requirement, however, was not met here. When the Colorado Civil Rights Commission considered this case, it did not do so with the religious neutrality that the Constitution requires.

Given all these considerations, it is proper to hold that whatever the outcome of some future controversy involving facts similar to these, the Commission's actions here violated the Free Exercise Clause; and its order must be set aside.

I

A

Masterpiece Cakeshop, Ltd., is a bakery in Lakewood, Colorado, a suburb of Denver. The shop offers a variety of baked goods, ranging from everyday cookies and brownies to elaborate custom-designed cakes for birthday parties, weddings, and other events.

Jack Phillips is an expert baker who has owned and operated the shop for 24 years. Phillips is a devout Christian. He has explained that his "main goal in life is to be obedient to" Jesus Christ and Christ's "teachings in all aspects of his life." App. 148. And he seeks to "honor God through his work at Masterpiece Cakeshop." *Ibid.* One of Phillips' religious beliefs is that "God's intention for marriage from the beginning of history is that it is and should be the union of one man and one woman." *Id.*, at 149. To Phillips, creating a wedding cake for a same-sex wedding would be equivalent to participating in a celebration that is contrary to his own most deeply held beliefs.

Phillips met Charlie Craig and Dave Mullins when they entered his shop in the summer of 2012. Craig and Mullins were planning to marry. At that time, Colorado did not recognize same-sex marriages, so the couple planned to wed legally in Massachusetts and afterwards to host a reception for their family and friends in Denver. To prepare for their celebration, Craig and Mullins visited the shop and told Phillips that they were interested in ordering a cake for "our wedding." *Id.*, at 152 (emphasis deleted). They did not mention the design of the cake they envisioned.

Phillips informed the couple that he does not "create" wedding cakes for same-sex weddings. *Ibid.* He explained, "I'll make your birthday cakes, shower cakes, sell you cookies and brownies, I just don't make cakes for same sex weddings." *Ibid.* The couple left the shop without further discussion.

The following day, Craig's mother, who had accompanied the couple to the cakeshop and been present for their interaction with Phillips, telephoned to ask Phillips why he had declined to serve her son. Phillips explained that he does not create wedding cakes for same-sex weddings because of his religious opposition to same-sex marriage, and also because Colorado (at that time) did not recognize same-sex marriages. *Id.*, at 153. He later explained his belief that "to create a wedding cake for an event that celebrates something that directly goes against the teachings of the Bible, would have been a personal endorsement and participation in the ceremony and relationship that they were entering into." *Ibid.* (emphasis deleted).

B

For most of its history, Colorado has prohibited discrimination in places of public accommodation. In 1885, less than a decade after Colorado achieved statehood, the General Assembly passed "An Act to Protect All Citizens

in Their Civil Rights," which guaranteed "full and equal enjoyment" of certain public facilities to "all citizens," "regardless of race, color or previous condition of servitude." 1885 Colo. Sess. Laws pp. 132–133. A decade later, the General Assembly expanded the requirement to apply to "all other places of public accommodation." 1895 Colo. Sess. Laws ch. 61, p. 139.

Today, the Colorado Anti-Discrimination Act (CADA) carries forward the state's tradition of prohibiting discrimination in places of public accommodation. Amended in 2007 and 2008 to prohibit discrimination on the basis of sexual orientation as well as other protected characteristics, CADA in relevant part provides as follows:

> "It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." Colo. Rev. Stat. §24–34–601(2)(a) (2017).

The Act defines "public accommodation" broadly to include any "place of business engaged in any sales to the public and any place offering services . . . to the public," but excludes "a church, synagogue, mosque, or other place that is principally used for religious purposes." §24–34–601(1).

CADA establishes an administrative system for the resolution of discrimination claims. Complaints of discrimination in violation of CADA are addressed in the first instance by the Colorado Civil Rights Division. The Division investigates each claim; and if it finds probable cause that CADA has been violated, it will refer the matter to the Colorado Civil Rights Commission. The Commission,

in turn, decides whether to initiate a formal hearing before a state Administrative Law Judge (ALJ), who will hear evidence and argument before issuing a written decision. See §§24–34–306, 24–4–105(14). The decision of the ALJ may be appealed to the full Commission, a seven-member appointed body. The Commission holds a public hearing and deliberative session before voting on the case. If the Commission determines that the evidence proves a CADA violation, it may impose remedial measures as provided by statute. See §24–34–306(9). Available remedies include, among other things, orders to cease-and-desist a discriminatory policy, to file regular compliance reports with the Commission, and "to take affirmative action, including the posting of notices setting forth the substantive rights of the public." §24–34–605. Colorado law does not permit the Commission to assess money damages or fines. §§24–34–306(9), 24–34–605.

C

Craig and Mullins filed a discrimination complaint against Masterpiece Cakeshop and Phillips in August 2012, shortly after the couple's visit to the shop. App. 31. The complaint alleged that Craig and Mullins had been denied "full and equal service" at the bakery because of their sexual orientation, *id.*, at 35, 48, and that it was Phillips' "standard business practice" not to provide cakes for same-sex weddings, *id.*, at 43.

The Civil Rights Division opened an investigation. The investigator found that "on multiple occasions," Phillips "turned away potential customers on the basis of their sexual orientation, stating that he could not create a cake for a same-sex wedding ceremony or reception" because his religious beliefs prohibited it and because the potential customers "were doing something illegal" at that time. *Id.*, at 76. The investigation found that Phillips had declined to sell custom wedding cakes to about six other

same-sex couples on this basis. *Id.*, at 72. The investiga-
tor also recounted that, according to affidavits submitted
by Craig and Mullins, Phillips' shop had refused to sell
cupcakes to a lesbian couple for their commitment celebra-
tion because the shop "had a policy of not selling baked
goods to same-sex couples for this type of event." *Id.*, at
73. Based on these findings, the Division found probable
cause that Phillips violated CADA and referred the case to
the Civil Rights Commission. *Id.*, at 69.

The Commission found it proper to conduct a formal
hearing, and it sent the case to a State ALJ. Finding no
dispute as to material facts, the ALJ entertained cross-
motions for summary judgment and ruled in the couple's
favor. The ALJ first rejected Phillips' argument that
declining to make or create a wedding cake for Craig and
Mullins did not violate Colorado law. It was undisputed
that the shop is subject to state public accommodations
laws. And the ALJ determined that Phillips' actions
constituted prohibited discrimination on the basis of sex-
ual orientation, not simply opposition to same-sex marriage
as Phillips contended. App. to Pet. for Cert. 68a–72a.

Phillips raised two constitutional claims before the ALJ.
He first asserted that applying CADA in a way that would
require him to create a cake for a same-sex wedding would
violate his First Amendment right to free speech by com-
pelling him to exercise his artistic talents to express a
message with which he disagreed. The ALJ rejected the
contention that preparing a wedding cake is a form of
protected speech and did not agree that creating Craig and
Mullins' cake would force Phillips to adhere to "an ideolog-
ical point of view." *Id.*, at 75a. Applying CADA to the
facts at hand, in the ALJ's view, did not interfere with
Phillips' freedom of speech.

Phillips also contended that requiring him to create
cakes for same-sex weddings would violate his right to the
free exercise of religion, also protected by the First

Amendment.  Citing this Court's precedent in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), the ALJ determined that CADA is a "valid and neutral law of general applicability" and therefore that applying it to Phillips in this case did not violate the Free Exercise Clause.  *Id.*, at 879; App. to Pet. for Cert. 82a–83a.  The ALJ thus ruled against Phillips and the cakeshop and in favor of Craig and Mullins on both constitutional claims.

The Commission affirmed the ALJ's decision in full.  *Id.*, at 57a.  The Commission ordered Phillips to "cease and desist from discriminating against . . . same-sex couples by refusing to sell them wedding cakes or any product [they] would sell to heterosexual couples."  *Ibid.*  It also ordered additional remedial measures, including "comprehensive staff training on the Public Accommodations section" of CADA "and changes to any and all company policies to comply with . . . this Order."  *Id.*, at 58a.  The Commission additionally required Phillips to prepare "quarterly compliance reports" for a period of two years documenting "the number of patrons denied service" and why, along with "a statement describing the remedial actions taken."  *Ibid.*

Phillips appealed to the Colorado Court of Appeals, which affirmed the Commission's legal determinations and remedial order.  The court rejected the argument that the "Commission's order unconstitutionally compels" Phillips and the shop "to convey a celebratory message about same sex marriage."  *Craig* v. *Masterpiece Cakeshop, Inc.*, 370 P. 3d 272, 283 (2015).  The court also rejected the argument that the Commission's order violated the Free Exercise Clause.  Relying on this Court's precedent in *Smith*, *supra*, at 879, the court stated that the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability" on the ground that following the law would interfere with religious practice or belief.  370 P. 3d, at 289.  The

court concluded that requiring Phillips to comply with the statute did not violate his free exercise rights. The Colorado Supreme Court declined to hear the case.

Phillips sought review here, and this Court granted certiorari. 582 U. S. ___ (2017). He now renews his claims under the Free Speech and Free Exercise Clauses of the First Amendment.

## II

### A

Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts. At the same time, the religious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression. As this Court observed in *Obergefell* v. *Hodges*, 576 U. S. ___ (2015), "[t]he First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Id.*, at ___ (slip op., at 27). Nevertheless, while those religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law. See *Newman* v. *Piggy Park Enterprises, Inc.*, 390 U. S. 400, 402, n. 5 (1968) (*per curiam*); see also *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 572 (1995) ("Provisions like these are well within the State's usual power to enact when a legislature has reason to

believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments").

When it comes to weddings, it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion.  This refusal would be well understood in our constitutional order as an exercise of religion, an exercise that gay persons could recognize and accept without serious diminishment to their own dignity and worth.  Yet if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations.

It is unexceptional that Colorado law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public.  And there are no doubt innumerable goods and services that no one could argue implicate the First Amendment.  Petitioners conceded, moreover, that if a baker refused to sell any goods or any cakes for gay weddings, that would be a different matter and the State would have a strong case under this Court's precedents that this would be a denial of goods and services that went beyond any protected rights of a baker who offers goods and services to the general public and is subject to a neutrally applied and generally applicable public accommodations law.  See Tr. of Oral Arg. 4–7, 10.

Phillips claims, however, that a narrower issue is presented.  He argues that he had to use his artistic skills to make an expressive statement, a wedding endorsement in

his own voice and of his own creation. As Phillips would see the case, this contention has a significant First Amendment speech component and implicates his deep and sincere religious beliefs. In this context the baker likely found it difficult to find a line where the customers' rights to goods and services became a demand for him to exercise the right of his own personal expression for their message, a message he could not express in a way consistent with his religious beliefs.

Phillips' dilemma was particularly understandable given the background of legal principles and administration of the law in Colorado at that time. His decision and his actions leading to the refusal of service all occurred in the year 2012. At that point, Colorado did not recognize the validity of gay marriages performed in its own State. See Colo. Const., Art. II, §31 (2012); 370 P. 3d, at 277. At the time of the events in question, this Court had not issued its decisions either in *United States* v. *Windsor*, 570 U. S. 744 (2013), or *Obergefell*. Since the State itself did not allow those marriages to be performed in Colorado, there is some force to the argument that the baker was not unreasonable in deeming it lawful to decline to take an action that he understood to be an expression of support for their validity when that expression was contrary to his sincerely held religious beliefs, at least insofar as his refusal was limited to refusing to create and express a message in support of gay marriage, even one planned to take place in another State.

At the time, state law also afforded storekeepers some latitude to decline to create specific messages the storekeeper considered offensive. Indeed, while enforcement proceedings against Phillips were ongoing, the Colorado Civil Rights Division itself endorsed this proposition in cases involving other bakers' creation of cakes, concluding on at least three occasions that a baker acted lawfully in declining to create cakes with decorations that demeaned

gay persons or gay marriages.  See *Jack* v. *Gateaux, Ltd.*,
Charge No. P20140071X (Mar. 24, 2015); *Jack* v. *Le Bak-
ery Sensual, Inc.*, Charge No. P20140070X (Mar. 24, 2015);
*Jack* v. *Azucar Bakery*, Charge No. P20140069X (Mar. 24,
2015).

There were, to be sure, responses to these arguments
that the State could make when it contended for a differ-
ent result in seeking the enforcement of its generally
applicable state regulations of businesses that serve the
public.  And any decision in favor of the baker would have
to be sufficiently constrained, lest all purveyors of goods
and services who object to gay marriages for moral and
religious reasons in effect be allowed to put up signs say-
ing "no goods or services will be sold if they will be used
for gay marriages," something that would impose a serious
stigma on gay persons.  But, nonetheless, Phillips was
entitled to the neutral and respectful consideration of his
claims in all the circumstances of the case.

B

The neutral and respectful consideration to which Phil-
lips was entitled was compromised here, however.  The
Civil Rights Commission's treatment of his case has some
elements of a clear and impermissible hostility toward the
sincere religious beliefs that motivated his objection.

That hostility surfaced at the Commission's formal,
public hearings, as shown by the record.  On May 30,
2014, the seven-member Commission convened publicly to
consider Phillips' case.  At several points during its meet-
ing, commissioners endorsed the view that religious beliefs
cannot legitimately be carried into the public sphere or
commercial domain, implying that religious beliefs and
persons are less than fully welcome in Colorado's business
community.  One commissioner suggested that Phillips
can believe "what he wants to believe," but cannot act on
his religious beliefs "if he decides to do business in the

state." Tr. 23. A few moments later, the commissioner restated the same position: "[I]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise." *Id.*, at 30. Standing alone, these statements are susceptible of different interpretations. On the one hand, they might mean simply that a business cannot refuse to provide services based on sexual orientation, regardless of the proprietor's personal views. On the other hand, they might be seen as inappropriate and dismissive comments showing lack of due consideration for Phillips' free exercise rights and the dilemma he faced. In view of the comments that followed, the latter seems the more likely.

On July 25, 2014, the Commission met again. This meeting, too, was conducted in public and on the record. On this occasion another commissioner made specific reference to the previous meeting's discussion but said far more to disparage Phillips' beliefs. The commissioner stated:

> "I would also like to reiterate what we said in the hearing or the last meeting. Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the holocaust, whether it be—I mean, we—we can list hundreds of situations where freedom of religion has been used to justify discrimination. And to me it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others." Tr. 11–12.

To describe a man's faith as "one of the most despicable pieces of rhetoric that people can use" is to disparage his religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetori-

cal—something insubstantial and even insincere. The commissioner even went so far as to compare Phillips' invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust. This sentiment is inappropriate for a Commission charged with the solemn responsibility of fair and neutral enforcement of Colorado's antidiscrimination law—a law that protects discrimination on the basis of religion as well as sexual orientation.

The record shows no objection to these comments from other commissioners. And the later state-court ruling reviewing the Commission's decision did not mention those comments, much less express concern with their content. Nor were the comments by the commissioners disavowed in the briefs filed in this Court. For these reasons, the Court cannot avoid the conclusion that these statements cast doubt on the fairness and impartiality of the Commission's adjudication of Phillips' case. Members of the Court have disagreed on the question whether statements made by lawmakers may properly be taken into account in determining whether a law intentionally discriminates on the basis of religion. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 540–542 (1993); *id.,* at 558 (Scalia, J., concurring in part and concurring in judgment). In this case, however, the remarks were made in a very different context—by an adjudicatory body deciding a particular case.

Another indication of hostility is the difference in treatment between Phillips' case and the cases of other bakers who objected to a requested cake on the basis of conscience and prevailed before the Commission.

As noted above, on at least three other occasions the Civil Rights Division considered the refusal of bakers to create cakes with images that conveyed disapproval of same-sex marriage, along with religious text. Each time, the Division found that the baker acted lawfully in refusing service. It made these determinations because, in the

words of the Division, the requested cake included "wording and images [the baker] deemed derogatory," *Jack* v. *Gateaux, Ltd.*, Charge No. P20140071X, at 4; featured "language and images [the baker] deemed hateful," *Jack* v. *Le Bakery Sensual, Inc.*, Charge No. P20140070X, at 4; or displayed a message the baker "deemed as discriminatory, *Jack* v. *Azucar Bakery*, Charge No. P20140069X, at 4.

The treatment of the conscience-based objections at issue in these three cases contrasts with the Commission's treatment of Phillips' objection. The Commission ruled against Phillips in part on the theory that any message the requested wedding cake would carry would be attributed to the customer, not to the baker. Yet the Division did not address this point in any of the other cases with respect to the cakes depicting anti-gay marriage symbolism. Additionally, the Division found no violation of CADA in the other cases in part because each bakery was willing to sell other products, including those depicting Christian themes, to the prospective customers. But the Commission dismissed Phillips' willingness to sell "birthday cakes, shower cakes, [and] cookies and brownies," App. 152, to gay and lesbian customers as irrelevant. The treatment of the other cases and Phillips' case could reasonably be interpreted as being inconsistent as to the question of whether speech is involved, quite apart from whether the cases should ultimately be distinguished. In short, the Commission's consideration of Phillips' religious objection did not accord with its treatment of these other objections.

Before the Colorado Court of Appeals, Phillips protested that this disparity in treatment reflected hostility on the part of the Commission toward his beliefs. He argued that the Commission had treated the other bakers' conscience-based objections as legitimate, but treated his as illegitimate—thus sitting in judgment of his religious beliefs themselves. The Court of Appeals addressed the disparity

only in passing and relegated its complete analysis of the issue to a footnote. There, the court stated that "[t]his case is distinguishable from the Colorado Civil Rights Division's recent findings that [the other bakeries] in Denver did not discriminate against a Christian patron on the basis of his creed" when they refused to create the requested cakes. 370 P. 3d, at 282, n. 8. In those cases, the court continued, there was no impermissible discrimination because "the Division found that the bakeries . . . refuse[d] the patron's request . . . because of the offensive nature of the requested message." *Ibid.*

A principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness. Just as "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943), it is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive. See *Matal* v. *Tam*, 582 U. S. ___, ___–___ (2017) (opinion of ALITO, J.) (slip op., at 22–23). The Colorado court's attempt to account for the difference in treatment elevates one view of what is offensive over another and itself sends a signal of official disapproval of Phillips' religious beliefs. The court's footnote does not, therefore, answer the baker's concern that the State's practice was to disfavor the religious basis of his objection.

## C

For the reasons just described, the Commission's treatment of Phillips' case violated the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint.

In *Church of Lukumi Babalu Aye, supra,* the Court made clear that the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose

regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. The Free Exercise Clause bars even "subtle departures from neutrality" on matters of religion. *Id.*, at 534. Here, that means the Commission was obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of Phillips' religious beliefs. The Constitution "commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Id.*, at 547.

Factors relevant to the assessment of governmental neutrality include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.*, at 540. In view of these factors the record here demonstrates that the Commission's consideration of Phillips' case was neither tolerant nor respectful of Phillips' religious beliefs. The Commission gave "every appearance," *id.*, at 545, of adjudicating Phillips' religious objection based on a negative normative "evaluation of the particular justification" for his objection and the religious grounds for it. *Id.*, at 537. It hardly requires restating that government has no role in deciding or even suggesting whether the religious ground for Phillips' conscience-based objection is legitimate or illegitimate. On these facts, the Court must draw the inference that Phillips' religious objection was not considered with the neutrality that the Free Exercise Clause requires.

While the issues here are difficult to resolve, it must be concluded that the State's interest could have been

weighed against Phillips' sincere religious objections in a way consistent with the requisite religious neutrality that must be strictly observed.   The official expressions of hostility to religion in some of the commissioners' comments—comments that were not disavowed at the Commission or by the State at any point in the proceedings that led to affirmance of the order—were inconsistent with what the Free Exercise Clause requires.   The Commission's disparate consideration of Phillips' case compared to the cases of the other bakers suggests the same.   For these reasons, the order must be set aside.

## III

The Commission's hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion.   Phillips was entitled to a neutral decisionmaker who would give full and fair consideration to his religious objection as he sought to assert it in all of the circumstances in which this case was presented, considered, and decided.   In this case the adjudication concerned a context that may well be different going forward in the respects noted above.   However later cases raising these or similar concerns are resolved in the future, for these reasons the rulings of the Commission and of the state court that enforced the Commission's order must be invalidated.

The outcome of cases like this in other circumstances must await further elaboration in the courts, all in the context of recognizing that these disputes must be resolved with tolerance, without undue disrespect to sincere religious beliefs, and without subjecting gay persons to indignities when they seek goods and services in an open market.

The judgment of the Colorado Court of Appeals is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

### No. 16–111

_____

## MASTERPIECE CAKESHOP, LTD., ET AL., PETITIONERS *v.* COLORADO CIVIL RIGHTS COMMISSION, ET AL.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF COLORADO

[June 4, 2018]

JUSTICE KAGAN, with whom JUSTICE BREYER joins, concurring.

"[I]t is a general rule that [religious and philosophical] objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Ante*, at 9. But in upholding that principle, state actors cannot show hostility to religious views; rather, they must give those views "neutral and respectful consideration." *Ante*, at 12. I join the Court's opinion in full because I believe the Colorado Civil Rights Commission did not satisfy that obligation. I write separately to elaborate on one of the bases for the Court's holding.

The Court partly relies on the "disparate consideration of Phillips' case compared to the cases of [three] other bakers" who "objected to a requested cake on the basis of conscience." *Ante*, at 14, 18. In the latter cases, a customer named William Jack sought "cakes with images that conveyed disapproval of same-sex marriage, along with religious text"; the bakers whom he approached refused to make them. *Ante*, at 15; see *post*, at 3 (GINSBURG, J., dissenting) (further describing the requested cakes). Those bakers prevailed before the Colorado Civil Rights Division and Commission, while Phillips—who objected for

religious reasons to baking a wedding cake for a same-sex
couple—did not.  The Court finds that the legal reasoning
of the state agencies differed in significant ways as be-
tween the Jack cases and the Phillips case.  See *ante,* at
15.  And the Court takes especial note of the suggestion
made by the Colorado Court of Appeals, in comparing
those cases, that the state agencies found the message
Jack requested "offensive [in] nature."  *Ante*, at 16 (inter-
nal quotation marks omitted).  As the Court states, a
"principled rationale for the difference in treatment" can-
not be "based on the government's own assessment of
offensiveness." *Ibid.*

What makes the state agencies' consideration yet more
disquieting is that a proper basis for distinguishing the
cases was available—in fact, was obvious.  The Colorado
Anti-Discrimination Act (CADA) makes it unlawful for a
place of public accommodation to deny "the full and equal
enjoyment" of goods and services to individuals based on
certain characteristics, including sexual orientation and
creed.  Colo. Rev. Stat. §24–34–601(2)(a) (2017).  The three
bakers in the Jack cases did not violate that law.  Jack
requested them to make a cake (one denigrating gay peo-
ple and same-sex marriage) that they would not have
made for any customer.  In refusing that request, the
bakers did not single out Jack because of his religion, but
instead treated him in the same way they would have
treated anyone else—just as CADA requires.  By contrast,
the same-sex couple in this case requested a wedding cake
that Phillips would have made for an opposite-sex couple.
In refusing that request, Phillips contravened CADA's
demand that customers receive "the full and equal enjoy-
ment" of public accommodations irrespective of their
sexual orientation.  *Ibid.*  The different outcomes in the
Jack cases and the Phillips case could thus have been
justified by a plain reading and neutral application of
Colorado law—untainted by any bias against a religious

belief.*

I read the Court's opinion as fully consistent with that
view. The Court limits its analysis to the *reasoning* of the
state agencies (and Court of Appeals)—"quite apart from
whether the [Phillips and Jack] cases should ultimately be
distinguished." *Ante*, at 15. And the Court itself recognizes
the principle that would properly account for a difference
in *result* between those cases. Colorado law, the Court

——————

*JUSTICE GORSUCH disagrees. In his view, the Jack cases and the
Phillips case must be treated the same because the bakers in all those
cases "would not sell the requested cakes to anyone." *Post*, at 4. That
description perfectly fits the Jack cases—and explains why the bakers
there did not engage in unlawful discrimination. But it is a surprising
characterization of the Phillips case, given that Phillips routinely sells
wedding cakes to opposite-sex couples. JUSTICE GORSUCH can make the
claim only because he does not think a "wedding cake" is the relevant
product. As JUSTICE GORSUCH sees it, the product that Phillips refused
to sell here—and would refuse to sell to anyone—was a "cake celebrat-
ing same-sex marriage." *Ibid.*; see *post*, at 3, 6, 8–9. But that is wrong.
The cake requested was not a special "cake celebrating same-sex
marriage." It was simply a wedding cake—one that (like other stand-
ard wedding cakes) is suitable for use at same-sex and opposite-sex
weddings alike. See *ante*, at 4 (majority opinion) (recounting that
Phillips did not so much as discuss the cake's design before he refused
to make it). And contrary to JUSTICE GORSUCH'S view, a wedding cake
does not become something different whenever a vendor like Phillips
invests its sale to particular customers with "religious significance."
*Post*, at 11. As this Court has long held, and reaffirms today, a vendor
cannot escape a public accommodations law because his religion disap-
proves selling a product to a group of customers, whether defined by
sexual orientation, race, sex, or other protected trait. See *Newman* v.
*Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402, n. 5 (1968) (*per
curiam*) (holding that a barbeque vendor must serve black customers
even if he perceives such service as vindicating racial equality, in
violation of his religious beliefs); *ante*, at 9. A vendor can choose the
products he sells, but not the customers he serves—no matter the
reason. Phillips sells wedding cakes. As to that product, he unlawfully
discriminates: He sells it to opposite-sex but not to same-sex couples.
And on that basis—which has nothing to do with Phillips' religious
beliefs—Colorado could have distinguished Phillips from the bakers in
the Jack cases, who did not engage in any prohibited discrimination.

says, "can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public." *Ante*, at 10. For that reason, Colorado can treat a baker who discriminates based on sexual orientation differently from a baker who does not discriminate on that or any other prohibited ground. But only, as the Court rightly says, if the State's decisions are not infected by religious hostility or bias. I accordingly concur.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–111

_____

MASTERPIECE CAKESHOP, LTD., ET AL., PETITIONERS
*v.* COLORADO CIVIL RIGHTS COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
COLORADO

[June 4, 2018]

JUSTICE GORSUCH, with whom JUSTICE ALITO joins,
concurring.

In *Employment Div., Dept. of Human Resources of Ore.*
v. *Smith*, this Court held that a neutral and generally
applicable law will usually survive a constitutional free
exercise challenge. 494 U. S. 872, 878–879 (1990). *Smith*
remains controversial in many quarters. Compare
McConnell, The Origins and Historical Understanding of
Free Exercise of Religion, 103 Harv. L. Rev. 1409 (1990),
with Hamburger, A Constitutional Right of Religious
Exemption: An Historical Perspective, 60 Geo. Wash. L.
Rev. 915 (1992). But we know this with certainty: when
the government fails to act neutrally toward the free
exercise of religion, it tends to run into trouble. Then the
government can prevail only if it satisfies strict scrutiny,
showing that its restrictions on religion both serve a com-
pelling interest and are narrowly tailored. *Church of
Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546
(1993).

Today's decision respects these principles. As the Court
explains, the Colorado Civil Rights Commission failed to
act neutrally toward Jack Phillips's religious faith. Maybe
most notably, the Commission allowed three other bakers
to refuse a customer's request that would have required
them to violate their secular commitments. Yet it denied

the same accommodation to Mr. Phillips when he refused a customer's request that would have required him to violate his religious beliefs. *Ante,* at 14–16. As the Court also explains, the only reason the Commission seemed to supply for its discrimination was that it found Mr. Phillips's religious beliefs "offensive." *Ibid.* That kind of judgmental dismissal of a sincerely held religious belief is, of course, antithetical to the First Amendment and cannot begin to satisfy strict scrutiny. The Constitution protects not just popular religious exercises from the condemnation of civil authorities. It protects them all. Because the Court documents each of these points carefully and thoroughly, I am pleased to join its opinion in full.

The only wrinkle is this. In the face of so much evidence suggesting hostility toward Mr. Phillips's sincerely held religious beliefs, two of our colleagues have written separately to suggest that the Commission acted neutrally toward his faith when it treated him differently from the other bakers—or that it could have easily done so consistent with the First Amendment. See *post,* at 4–5, and n. 4 (GINSBURG, J., dissenting); *ante,* at 2–3, and n. (KAGAN, J., concurring). But, respectfully, I do not see how we might rescue the Commission from its error.

A full view of the facts helps point the way to the problem. Start with William Jack's case. He approached three bakers and asked them to prepare cakes with messages disapproving same-sex marriage on religious grounds. App. 233, 243, 252. All three bakers refused Mr. Jack's request, stating that they found his request offensive to their secular convictions. *Id.,* at 231, 241, 250. Mr. Jack responded by filing complaints with the Colorado Civil Rights Division. *Id.,* at 230, 240, 249. He pointed to Colorado's Anti-Discrimination Act, which prohibits discrimination against customers in public accommodations because of religious creed, sexual orientation, or certain other traits. See *ibid.*; Colo. Rev. Stat. §24–34–601(2)(a)

(2017). Mr. Jack argued that the cakes he sought reflected his religious beliefs and that the bakers could not refuse to make them just because they happened to disagree with his beliefs. App. 231, 241, 250. But the Division declined to find a violation, reasoning that the bakers didn't deny Mr. Jack service because of his religious faith but because the cakes he sought were offensive to their own moral convictions. *Id.*, at 237, 247, 255–256. As proof, the Division pointed to the fact that the bakers said they treated Mr. Jack as they would have anyone who requested a cake with similar messages, regardless of their religion. *Id.*, at 230–231, 240, 249. The Division pointed, as well, to the fact that the bakers said they were happy to provide religious persons with other cakes expressing other ideas. *Id.*, at 237, 247, 257. Mr. Jack appealed to the Colorado Civil Rights Commission, but the Commission summarily denied relief. App. to Pet. for Cert. 326a–331a.

Next, take the undisputed facts of Mr. Phillips's case. Charlie Craig and Dave Mullins approached Mr. Phillips about creating a cake to celebrate their wedding. App. 168. Mr. Phillips explained that he could not prepare a cake celebrating a same-sex wedding consistent with his religious faith. *Id.,* at 168–169. But Mr. Phillips offered to make other baked goods for the couple, including cakes celebrating other occasions. *Ibid.* Later, Mr. Phillips testified without contradiction that he would have refused to create a cake celebrating a same-sex marriage for any customer, regardless of his or her sexual orientation. *Id.,* at 166–167 ("I will not design and create wedding cakes for a same-sex wedding regardless of the sexual orientation of the customer"). And the record reveals that Mr. Phillips apparently refused just such a request from Mr. Craig's mother. *Id.,* at 38–40, 169. (Any suggestion that Mr. Phillips was willing to make a cake celebrating a same-sex marriage for a heterosexual customer or was not willing to sell other products to a homosexual customer,

then, would simply mistake the undisputed factual record. See *post,* at 4, n. 2 (GINSBURG, J., dissenting); *ante,* at 2–3, and n. (KAGAN, J., concurring)). Nonetheless, the Commission held that Mr. Phillips's conduct violated the Colorado public accommodations law. App. to Pet. for Cert. 56a–58a.

The facts show that the two cases share all legally salient features. In both cases, the effect on the customer was the same: bakers refused service to persons who bore a statutorily protected trait (religious faith or sexual orientation). But in both cases the bakers refused service intending only to honor a personal conviction. To be sure, the bakers *knew* their conduct promised the effect of leaving a customer in a protected class unserved. But there's no indication the bakers actually *intended* to refuse service *because of* a customer's protected characteristic. We know this because all of the bakers explained without contradiction that they would not sell the requested cakes to anyone, while they would sell other cakes to members of the protected class (as well as to anyone else). So, for example, the bakers in the first case would have refused to sell a cake denigrating same-sex marriage to an atheist customer, just as the baker in the second case would have refused to sell a cake celebrating same-sex marriage to a heterosexual customer. And the bakers in the first case were generally happy to sell to persons of faith, just as the baker in the second case was generally happy to sell to gay persons. In both cases, it was the kind of cake, not the kind of customer, that mattered to the bakers.

The distinction between intended and knowingly accepted effects is familiar in life and law. Often the purposeful pursuit of worthy commitments requires us to accept unwanted but entirely foreseeable side effects: so, for example, choosing to spend time with family means the foreseeable loss of time for charitable work, just as opting for more time in the office means knowingly forgoing time

at home with loved ones. The law, too, sometimes distinguishes between intended and foreseeable effects. See, *e.g.,* ALI, Model Penal Code §§1.13, 2.02(2)(a)(i) (1985); 1 W. LaFave, Substantive Criminal Law §5.2(b), pp. 460–463 (3d ed. 2018). Other times, of course, the law proceeds differently, either conflating intent and knowledge or presuming intent as a matter of law from a showing of knowledge. See, *e.g.,* Restatement (Second) of Torts §8A (1965); *Radio Officers* v. *NLRB*, 347 U. S. 17, 45 (1954).

The problem here is that the Commission failed to act neutrally by applying a consistent legal rule. In Mr. Jack's case, the Commission chose to distinguish carefully between intended and knowingly accepted effects. Even though the bakers knowingly denied service to someone in a protected class, the Commission found no violation because the bakers only intended to distance themselves from "the offensive nature of the requested message." *Craig* v. *Masterpiece Cakeshop, Inc.*, 370 P. 3d 272, 282, n. 8 (Colo. App. 2015); App. 237, 247, 256; App. to Pet. for Cert. 326a–331a; see also Brief for Respondent Colorado Civil Rights Commission 52 ("Businesses are entitled to reject orders for any number of reasons, including because they deem a particular product requested by a customer to be 'offensive'"). Yet, in Mr. Phillips's case, the Commission dismissed this very same argument as resting on a "distinction without a difference." App. to Pet. for Cert. 69a. It concluded instead that an "intent to disfavor" a protected class of persons should be "readily . . . presumed" from the knowing failure to serve someone who belongs to that class. *Id.,* at 70a. In its judgment, Mr. Phillips's intentions were "inextricably tied to the sexual orientation of the parties involved" and essentially "irrational." *Ibid.*

Nothing in the Commission's opinions suggests any neutral principle to reconcile these holdings. If Mr. Phillips's objection is "inextricably tied" to a protected class,

then the bakers' objection in Mr. Jack's case must be "inextricably tied" to one as well. For just as cakes celebrating same-sex weddings are (usually) requested by persons of a particular sexual orientation, so too are cakes expressing religious opposition to same-sex weddings (usually) requested by persons of particular religious faiths. In both cases the bakers' objection would (usually) result in turning down customers who bear a protected characteristic. In the end, the Commission's decisions simply reduce to this: it *presumed* that Mr. Phillip harbored an intent to discriminate against a protected class in light of the foreseeable effects of his conduct, but it declined to presume the same intent in Mr. Jack's case even though the effects of the bakers' conduct were just as foreseeable. Underscoring the double standard, a state appellate court said that "no such showing" of actual "animus"—or intent to discriminate against persons in a protected class—was even required in Mr. Phillips's case. 370 P. 3d, at 282.

The Commission cannot have it both ways. The Commission cannot slide up and down the *mens rea* scale, picking a mental state standard to suit its tastes depending on its sympathies. Either actual proof of intent to discriminate on the basis of membership in a protected class is required (as the Commission held in Mr. Jack's case), or it is sufficient to "presume" such intent from the knowing failure to serve someone in a protected class (as the Commission held in Mr. Phillips's case). Perhaps the Commission could have chosen either course as an initial matter. But the one thing it can't do is apply a more generous legal test to secular objections than religious ones. See *Church of Lukumi Babalu Aye,* 508 U. S., at 543–544. That is anything but the neutral treatment of religion.

The real explanation for the Commission's discrimination soon comes clear, too—and it does anything but help

its cause. This isn't a case where the Commission self-consciously announced a change in its legal rule in all public accommodation cases. Nor is this a case where the Commission offered some persuasive reason for its discrimination that might survive strict scrutiny. Instead, as the Court explains, it appears the Commission wished to condemn Mr. Phillips for expressing just the kind of "irrational" or "offensive . . . message" that the bakers in the first case refused to endorse. *Ante,* at 16. Many may agree with the Commission and consider Mr. Phillips's religious beliefs irrational or offensive. Some may believe he misinterprets the teachings of his faith. And, to be sure, this Court has held same-sex marriage a matter of constitutional right and various States have enacted laws that preclude discrimination on the basis of sexual orientation. But it is also true that no bureaucratic judgment condemning a sincerely held religious belief as "irrational" or "offensive" will ever survive strict scrutiny under the First Amendment. In this country, the place of secular officials isn't to sit in judgment of religious beliefs, but only to protect their free exercise. Just as it is the "proudest boast of our free speech jurisprudence" that we protect speech that we hate, it must be the proudest boast of our free exercise jurisprudence that we protect religious beliefs that we find offensive. See *Matal* v. *Tam*, 582 U. S. \_\_\_, \_\_\_ (2017) (plurality opinion) (slip op., at 25) (citing *United States* v. *Schwimmer*, 279 U. S. 644, 655 (1929) (Holmes, J., dissenting)). Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove this country's commitment to serving as a refuge for religious freedom. See *Church of Lukumi Babalu Aye, supra*, at 547; *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 715–716 (1981); *Wisconsin* v. *Yoder*, 406 U. S. 205, 223–224 (1972); *Cantwell* v. *Connecticut*, 310 U. S. 296, 308–310 (1940).

Nor can any amount of after-the-fact maneuvering by

our colleagues save the Commission. It is no answer, for example, to observe that Mr. Jack requested a cake with text on it while Mr. Craig and Mr. Mullins sought a cake celebrating their wedding without discussing its decoration, and then suggest this distinction makes all the difference. See *post,* at 4–5, and n. 4 (GINSBURG, J., dissenting). It is no answer either simply to slide up a level of generality to redescribe Mr. Phillips's case as involving only a wedding cake like any other, so the fact that Mr. Phillips would make one for some means he must make them for all. See *ante,* at 2–3, and n. (KAGAN, J., concurring). These arguments, too, fail to afford Mr. Phillips's faith neutral respect.

Take the first suggestion first. To suggest that cakes with words convey a message but cakes without words do not—all in order to excuse the bakers in Mr. Jack's case while penalizing Mr. Phillips—is irrational. Not even the Commission or court of appeals purported to rely on that distinction. Imagine Mr. Jack asked only for a cake with a symbolic expression against same-sex marriage rather than a cake bearing words conveying the same idea. Surely the Commission would have approved the bakers' intentional wish to avoid participating in that message too. Nor can anyone reasonably doubt that a wedding cake without words conveys a message. Words or not and whatever the exact design, it celebrates a wedding, and if the wedding cake is made for a same-sex couple it celebrates a same-sex wedding. See 370 P. 3d, at 276 (stating that Mr. Craig and Mr. Mullins "requested that Phillips design and create a *cake to celebrate their same-sex wedding*") (emphasis added). Like "an emblem or flag," a cake for a same-sex wedding is a symbol that serves as "a short cut from mind to mind," signifying approval of a specific "system, idea, [or] institution." *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 632 (1943). It is precisely that approval that Mr. Phillips intended to withhold in keeping

with his religious faith. The Commission denied Mr. Phillips that choice, even as it afforded the bakers in Mr. Jack's case the choice to refuse to advance a message they deemed offensive to their secular commitments. That is not neutral.

Nor would it be proper for this or any court to suggest that a person must be forced to write words rather than create a symbol before his religious faith is implicated. Civil authorities, whether "high or petty," bear no license to declare what is or should be "orthodox" when it comes to religious beliefs, *id.,* at 642, or whether an adherent has "correctly perceived" the commands of his religion, *Thomas, supra,* at 716. Instead, it is our job to look beyond the formality of written words and afford legal protection to any sincere act of faith. See generally *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 569 (1995) ("[T]he Constitution looks beyond written or spoken words as mediums of expression," which are "not a condition of constitutional protection").

The second suggestion fares no better. Suggesting that this case is only about "wedding cakes"—and not a wedding cake celebrating a same-sex wedding—actually points up the problem. At its most general level, the cake at issue in Mr. Phillips's case was just a mixture of flour and eggs; at its most specific level, it was a cake celebrating the same-sex wedding of Mr. Craig and Mr. Mullins. We are told here, however, to apply a sort of Goldilocks rule: describing the cake by its ingredients is *too general*; understanding it as celebrating a same-sex wedding is *too specific*; but regarding it as a generic wedding cake is *just right*. The problem is, the Commission didn't play with the level of generality in Mr. Jack's case in this way. It didn't declare, for example, that because the cakes Mr. Jack requested were just cakes about weddings generally, and all such cakes were the same, the bakers had to pro-

duce them. Instead, the Commission accepted the bakers'
view that the specific cakes Mr. Jack requested conveyed a
message offensive to their convictions and allowed them to
refuse service. Having done that there, it must do the
same here.

Any other conclusion would invite civil authorities to
gerrymander their inquiries based on the parties they
prefer. Why calibrate the level of generality in Mr. Phil-
lips's case at "wedding cakes" exactly—and not at, say,
"cakes" more generally or "cakes that convey a message
regarding same-sex marriage" more specifically? If
"cakes" were the relevant level of generality, the Commis-
sion would have to order the bakers to make Mr. Jack's
requested cakes just as it ordered Mr. Phillips to make the
requested cake in his case. Conversely, if "cakes that
convey a message regarding same-sex marriage" were the
relevant level of generality, the Commission would have to
respect Mr. Phillips's refusal to make the requested cake
just as it respected the bakers' refusal to make the cakes
Mr. Jack requested. In short, when the same level of
generality is applied to both cases, it is no surprise that
the bakers have to be treated the same. Only by adjusting
the dials *just right*—fine-tuning the level of generality up
or down for each case based solely on the identity of the
parties and the substance of their views—can you engi-
neer the Commission's outcome, handing a win to Mr.
Jack's bakers but delivering a loss to Mr. Phillips. Such
results-driven reasoning is improper. Neither the Com-
mission nor this Court may apply a more specific level of
generality in Mr. Jack's case (a cake that conveys a mes-
sage regarding same-sex marriage) while applying a higher
level of generality in Mr. Phillips's case (a cake that
conveys no message regarding same-sex marriage). Of
course, under *Smith* a vendor cannot escape a public
accommodations law just because his religion frowns on it.
But for any law to comply with the First Amendment and

*Smith*, it must be applied in a manner that treats religion with neutral respect. That means the government must apply the *same* level of generality across cases—and that did not happen here.

There is another problem with sliding up the generality scale: it risks denying constitutional protection to religious beliefs that draw distinctions more specific than the government's preferred level of description. To some, all wedding cakes may appear indistinguishable. But *to Mr. Phillips* that is not the case—his faith teaches him otherwise. And his religious beliefs are entitled to no less respectful treatment than the bakers' secular beliefs in Mr. Jack's case. This Court has explained these same points "[r]epeatedly and in many different contexts" over many years. *Smith*, 494 U. S. at 887. For example, in *Thomas* a faithful Jehovah's Witness and steel mill worker agreed to help manufacture sheet steel he knew might find its way into armaments, but he was unwilling to work on a fabrication line producing tank turrets. 450 U. S., at 711. Of course, the line Mr. Thomas drew wasn't the same many others would draw and it wasn't even the same line many other members of the same faith would draw. Even so, the Court didn't try to suggest that making steel is just making steel. Or that to offend his religion the steel needed to be of a particular kind or shape. Instead, it recognized that Mr. Thomas alone was entitled to define the nature of his religious commitments—and that those commitments, as defined by the faithful adherent, not a bureaucrat or judge, are entitled to protection under the First Amendment. *Id.,* at 714–716; see also *United States* v. *Lee*, 455 U. S. 252, 254–255 (1982); *Smith*, *supra,* at 887 (collecting authorities). It is no more appropriate for the United States Supreme Court to tell Mr. Phillips that a wedding cake is just like any other—without regard to the religious significance his faith may attach to it—than it would be for the Court to suggest that for all persons

sacramental bread is *just* bread or a kippah is *just* a cap.

Only one way forward now remains. Having failed to afford Mr. Phillips's religious objections neutral consideration and without any compelling reason for its failure, the Commission must afford him the same result it afforded the bakers in Mr. Jack's case. The Court recognizes this by reversing the judgment below and holding that the Commission's order "must be set aside." *Ante,* at 18. Maybe in some future rulemaking or case the Commission could adopt a new "knowing" standard for all refusals of service and offer neutral reasons for doing so. But, as the Court observes, "[h]owever later cases raising these or similar concerns are resolved in the future, . . . the rulings of the Commission and of the state court that enforced the Commission's order" in *this* case "must be invalidated." *Ibid.* Mr. Phillips has conclusively proven a First Amendment violation and, after almost six years facing unlawful civil charges, he is entitled to judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–111

_____

MASTERPIECE CAKESHOP, LTD., ET AL., PETITIONERS
*v.* COLORADO CIVIL RIGHTS COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
COLORADO

[June 4, 2018]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring in part and concurring in the judgment.

I agree that the Colorado Civil Rights Commission (Commission) violated Jack Phillips' right to freely exercise his religion. As JUSTICE GORSUCH explains, the Commission treated Phillips' case differently from a similar case involving three other bakers, for reasons that can only be explained by hostility toward Phillips' religion. See *ante,* at 2–7 (concurring opinion). The Court agrees that the Commission treated Phillips differently, and it points out that some of the Commissioners made comments disparaging Phillips' religion. See *ante,* at 12–16. Although the Commissioners' comments are certainly disturbing, the discriminatory application of Colorado's public-accommodations law is enough on its own to violate Phillips' rights. To the extent the Court agrees, I join its opinion.

While Phillips rightly prevails on his free-exercise claim, I write separately to address his free-speech claim. The Court does not address this claim because it has some uncertainties about the record. See *ante,* at 2. Specifically, the parties dispute whether Phillips refused to create a *custom* wedding cake for the individual respondents, or whether he refused to sell them *any* wedding cake (including a premade one). But the Colorado Court of Appeals

resolved this factual dispute in Phillips' favor. The court described his conduct as a refusal to "design and create a cake to celebrate [a] same-sex wedding." *Craig* v. *Masterpiece Cakeshop, Inc.*, 370 P. 3d 272, 276 (2015); see also *id.,* at 286 ("designing and selling a wedding cake"); *id.,* at 283 ("refusing to create a wedding cake"). And it noted that the Commission's order required Phillips to sell "'*any* product [he] would sell to heterosexual couples,'" including custom wedding cakes. *Id.,* at 286 (emphasis added).

Even after describing his conduct this way, the Court of Appeals concluded that Phillips' conduct was not expressive and was not protected speech. It reasoned that an outside observer would think that Phillips was merely complying with Colorado's public-accommodations law, not expressing a message, and that Phillips could post a disclaimer to that effect. This reasoning flouts bedrock principles of our free-speech jurisprudence and would justify virtually any law that compels individuals to speak. It should not pass without comment.

## I

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits state laws that abridge the "freedom of speech." When interpreting this command, this Court has distinguished between regulations of speech and regulations of conduct. The latter generally do not abridge the freedom of speech, even if they impose "incidental burdens" on expression. *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 567 (2011). As the Court explains today, public-accommodations laws usually regulate conduct. *Ante,* at 9–10 (citing *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 572 (1995)). "[A]s a general matter," public-accommodations laws do not "target speech" but instead prohibit "the *act* of discriminating against individuals in the provision of publicly available goods, privileges,

and services." *Id.,* at 572 (emphasis added).

Although public-accommodations laws generally regulate conduct, particular applications of them can burden protected speech. When a public-accommodations law "ha[s] the effect of declaring . . . speech itself to be the public accommodation," the First Amendment applies with full force. *Id.,* at 573; accord, *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 657–659 (2000). In *Hurley*, for example, a Massachusetts public-accommodations law prohibited "'any distinction, discrimination or restriction on account of . . . sexual orientation . . . relative to the admission of any person to, or treatment in any place of public accommodation.'" 515 U. S.*,* at 561 (quoting Mass. Gen. Laws §272:98 (1992); ellipsis in original). When this law required the sponsor of a St. Patrick's Day parade to include a parade unit of gay, lesbian, and bisexual Irish-Americans, the Court unanimously held that the law violated the sponsor's right to free speech. Parades are "a form of expression," this Court explained, and the application of the public-accommodations law "alter[ed] the expressive content" of the parade by forcing the sponsor to add a new unit. 515 U. S., at 568, 572–573. The addition of that unit compelled the organizer to "bear witness to the fact that some Irish are gay, lesbian, or bisexual"; "suggest . . . that people of their sexual orientation have as much claim to unqualified social acceptance as heterosexuals"; and imply that their participation "merits celebration." *Id.,* at 574. While this Court acknowledged that the unit's exclusion might have been "misguided, or even hurtful," *ibid.*, it rejected the notion that governments can mandate "thoughts and statements acceptable to some groups or, indeed, all people" as the "antithesis" of free speech, *id.,* at 579; accord, *Dale*, *supra,* at 660–661.

The parade in *Hurley* was an example of what this Court has termed "expressive conduct." See 515 U. S., at 568–569. This Court has long held that "the Constitution

looks beyond written or spoken words as mediums of expression," *id.*, at 569, and that "[s]ymbolism is a primitive but effective way of communicating ideas," *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 632 (1943). Thus, a person's "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas* v. *Johnson*, 491 U. S. 397, 404 (1989). Applying this principle, the Court has recognized a wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag.[1]

Of course, conduct does not qualify as protected speech simply because "the person engaging in [it] intends thereby to express an idea." *United States* v. *O'Brien*, 391 U. S. 367, 376 (1968). To determine whether conduct is sufficiently expressive, the Court asks whether it was "intended to be communicative" and, "in context, would reasonably be understood by the viewer to be communicative." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 294 (1984). But a "'particularized message'" is not required, or else the freedom of speech "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley*, 515 U. S., at 569.

Once a court concludes that conduct is expressive, the

—————

[1] *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 565–566 (1991); *Texas* v. *Johnson*, 491 U. S. 397, 405–406 (1989); *Spence* v. *Washington*, 418 U. S. 405, 406, 409–411 (1974) (*per curiam*); *Schacht* v. *United States*, 398 U. S. 58, 62–63 (1970); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 505–506 (1969); *Brown* v. *Louisiana*, 383 U. S. 131, 141–142 (1966) (opinion of Fortas, J.); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 633–634 (1943); *Stromberg* v. *California*, 283 U. S. 359, 361, 369 (1931).

Constitution limits the government's authority to restrict or compel it. "[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say'" and "tailor" the content of his message as he sees fit. *Id.,* at 573 (quoting *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1, 16 (1986) (plurality opinion)). This rule "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, *supra*, at 573. And it "makes no difference" whether the government is regulating the "creati[on], distributi[on], or consum[ption]" of the speech. *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 792, n. 1 (2011).

## II
## A

The conduct that the Colorado Court of Appeals ascribed to Phillips—creating and designing custom wedding cakes—is expressive. Phillips considers himself an artist. The logo for Masterpiece Cakeshop is an artist's paint palette with a paintbrush and baker's whisk. Behind the counter Phillips has a picture that depicts him as an artist painting on a canvas. Phillips takes exceptional care with each cake that he creates—sketching the design out on paper, choosing the color scheme, creating the frosting and decorations, baking and sculpting the cake, decorating it, and delivering it to the wedding. Examples of his creations can be seen on Masterpiece's website. See http://masterpiececakes.com/wedding-cakes (as last visited June 1, 2018).

Phillips is an active participant in the wedding celebration. He sits down with each couple for a consultation before he creates their custom wedding cake. He discusses their preferences, their personalities, and the details of their wedding to ensure that each cake reflects the couple

who ordered it. In addition to creating and delivering the cake—a focal point of the wedding celebration—Phillips sometimes stays and interacts with the guests at the wedding. And the guests often recognize his creations and seek his bakery out afterward. Phillips also sees the inherent symbolism in wedding cakes. To him, a wedding cake inherently communicates that "a wedding has occurred, a marriage has begun, and the couple should be celebrated." App. 162.

Wedding cakes do, in fact, communicate this message. A tradition from Victorian England that made its way to America after the Civil War, "[w]edding cakes are so packed with symbolism that it is hard to know where to begin." M. Krondl, Sweet Invention: A History of Dessert 321 (2011) (Krondl); see also *ibid.* (explaining the symbolism behind the color, texture, flavor, and cutting of the cake). If an average person walked into a room and saw a white, multi-tiered cake, he would immediately know that he had stumbled upon a wedding. The cake is "so standardised and inevitable a part of getting married that few ever think to question it." Charsley, Interpretation and Custom: The Case of the Wedding Cake, 22 Man 93, 95 (1987). Almost no wedding, no matter how spartan, is missing the cake. See *id.,* at 98. "A whole series of events expected in the context of a wedding would be impossible without it: an essential photograph, the cutting, the toast, and the distribution of both cake and favours at the wedding and afterwards." *Ibid.* Although the cake is eventually eaten, that is not its primary purpose. See *id.,* at 95 ("It is not unusual to hear people declaring that they do not like wedding cake, meaning that they do not like to eat it. This includes people who are, without question, having such cakes for their weddings"); *id.,* at 97 ("Nothing is made of the eating itself"); Krondl 320–321 (explaining that wedding cakes have long been described as "inedible"). The cake's purpose is to mark the beginning of a

new marriage and to celebrate the couple.[2]

Accordingly, Phillips' creation of custom wedding cakes is expressive. The use of his artistic talents to create a well-recognized symbol that celebrates the beginning of a marriage clearly communicates a message—certainly more so than nude dancing, *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 565–566 (1991), or flying a plain red flag, *Stromberg* v. *California*, 283 U. S. 359, 369 (1931).[3] By forcing Phillips to create custom wedding cakes for same-

———————

[2] The Colorado Court of Appeals acknowledged that "a wedding cake, in some circumstances, may convey a particularized message celebrating same-sex marriage," depending on its "design" and whether it has "written inscriptions." *Craig* v. *Masterpiece Cakeshop, Inc.*, 370 P. 3d 272, 288 (2015). But a wedding cake needs no particular design or written words to communicate the basic message that a wedding is occurring, a marriage has begun, and the couple should be celebrated. Wedding cakes have long varied in color, decorations, and style, but those differences do not prevent people from recognizing wedding cakes as wedding cakes. See Charsley, Interpretation and Custom: The Case of the Wedding Cake, 22 Man 93, 96 (1987). And regardless, the Commission's order does not distinguish between plain wedding cakes and wedding cakes with particular designs or inscriptions; it requires Phillips to make any wedding cake for a same-sex wedding that he would make for an opposite-sex wedding.

[3] The dissent faults Phillips for not "submitting . . . evidence" that wedding cakes communicate a message. *Post,* at 2, n. 1 (opinion of GINSBURG, J.). But this requirement finds no support in our precedents. This Court did not insist that the parties submit evidence detailing the expressive nature of parades, flags, or nude dancing. See *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 568–570 (1995); *Spence*, 418 U. S., at 410–411; *Barnes*, 501 U. S., at 565–566. And we do not need extensive evidence here to conclude that Phillips' artistry is expressive, see *Hurley*, 515 U. S., at 569, or that wedding cakes at least communicate the basic fact that "this is a wedding," see *id.,* at 573–575. Nor does it matter that the couple also communicates a message through the cake. More than one person can be engaged in protected speech at the same time. See *id.*, at 569–570. And by forcing him to provide the cake, Colorado is requiring Phillips to be "intimately connected" with the couple's speech, which is enough to implicate his First Amendment rights. See *id.,* at 576.

sex weddings, Colorado's public-accommodations law "alter[s] the expressive content" of his message. *Hurley*, 515 U. S., at 572. The meaning of expressive conduct, this Court has explained, depends on "the context in which it occur[s]." *Johnson*, 491 U. S., at 405. Forcing Phillips to make custom wedding cakes for same-sex marriages requires him to, at the very least, acknowledge that same-sex weddings are "weddings" and suggest that they should be celebrated—the precise message he believes his faith forbids. The First Amendment prohibits Colorado from requiring Phillips to "bear witness to [these] fact[s]," *Hurley*, 515 U. S., at 574, or to "affir[m] . . . a belief with which [he] disagrees," *id.,* at 573.

B

The Colorado Court of Appeals nevertheless concluded that Phillips' conduct was "not sufficiently expressive" to be protected from state compulsion. 370 P. 3d, at 283. It noted that a reasonable observer would not view Phillips' conduct as "an endorsement of same-sex marriage," but rather as mere "compliance" with Colorado's public-accommodations law. *Id.,* at 286–287 (citing *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 64–65 (2006) (*FAIR*); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 841–842 (1995); *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 76–78 (1980)). It also emphasized that Masterpiece could "disassociat[e]" itself from same-sex marriage by posting a "disclaimer" stating that Colorado law "requires it not to discriminate" or that "the provision of its services does not constitute an endorsement." 370 P. 3d, at 288. This reasoning is badly misguided.

1

The Colorado Court of Appeals was wrong to conclude that Phillips' conduct was not expressive because a rea-

sonable observer would think he is merely complying with Colorado's public-accommodations law. This argument would justify any law that compelled protected speech. And, this Court has never accepted it. From the beginning, this Court's compelled-speech precedents have rejected arguments that "would resolve every issue of power in favor of those in authority." *Barnette*, 319 U. S., at 636. *Hurley*, for example, held that the application of Massachusetts' public-accommodations law "requir[ed] [the organizers] to alter the expressive content of their parade." 515 U. S., at 572–573. It did not hold that reasonable observers would view the organizers as merely complying with Massachusetts' public-accommodations law.

The decisions that the Colorado Court of Appeals cited for this proposition are far afield. It cited three decisions where groups objected to being forced to provide a forum for a third party's speech. See *FAIR*, *supra*, at 51 (law school refused to allow military recruiters on campus); *Rosenberger*, *supra*, at 822–823 (public university refused to provide funds to a religious student paper); *PruneYard*, *supra*, at 77 (shopping center refused to allow individuals to collect signatures on its property). In those decisions, this Court rejected the argument that requiring the groups to provide a forum for third-party speech also required them to endorse that speech. See *FAIR*, *supra*, at 63–65; *Rosenberger*, *supra*, at 841–842; *PruneYard*, *supra*, at 85–88. But these decisions do not suggest that the government can force speakers to alter their *own* message. See *Pacific Gas & Elec.*, 475 U. S., at 12 ("Notably absent from *PruneYard* was any concern that access . . . might affect the shopping center owner's exercise of his own right to speak"); *Hurley*, *supra*, at 580 (similar).

The Colorado Court of Appeals also noted that Masterpiece is a "for-profit bakery" that "charges its customers." 370 P. 3d, at 287. But this Court has repeatedly rejected the notion that a speaker's profit motive gives the gov-

ernment a freer hand in compelling speech.  See *Pacific Gas & Elec.*, *supra*, at 8, 16 (collecting cases); *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 761 (1976) (deeming it "beyond serious dispute" that "[s]peech . . . is protected even though it is carried in a form that is 'sold' for profit").  Further, even assuming that most for-profit companies prioritize maximizing profits over communicating a message, that is not true for Masterpiece Cakeshop.  Phillips routinely sacrifices profits to ensure that Masterpiece operates in a way that represents his Christian faith.  He is not open on Sundays, he pays his employees a higher-than-average wage, and he loans them money in times of need.  Phillips also refuses to bake cakes containing alcohol, cakes with racist or homophobic messages, cakes criticizing God, and cakes celebrating Halloween—even though Halloween is one of the most lucrative seasons for bakeries.  These efforts to exercise control over the messages that Masterpiece sends are still more evidence that Phillips' conduct is expressive.  See *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 256–258 (1974); *Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. ___, ___ (2015) (slip op., at 15).

2

The Colorado Court of Appeals also erred by suggesting that Phillips could simply post a disclaimer, disassociating Masterpiece from any support for same-sex marriage. Again, this argument would justify any law compelling speech.  And again, this Court has rejected it.  We have described similar arguments as "beg[ging] the core question." *Tornillo*, *supra*, at 256.  Because the government cannot compel speech, it also cannot "require speakers to affirm in one breath that which they deny in the next." *Pacific Gas & Elec.*, 475 U. S., at 16; see also *id.,* at 15, n. 11 (citing *PruneYard*, 447 U. S., at 99 (Powell, J., con-

curring in part and concurring in judgment)). States cannot put individuals to the choice of "be[ing] compelled to affirm someone else's belief" or "be[ing] forced to speak when [they] would prefer to remain silent." *Id.,* at 99.

### III

Because Phillips' conduct (as described by the Colorado Court of Appeals) was expressive, Colorado's public-accommodations law cannot penalize it unless the law withstands strict scrutiny. Although this Court sometimes reviews regulations of expressive conduct under the more lenient test articulated in *O'Brien*,[4] that test does not apply unless the government would have punished the conduct regardless of its expressive component. See, *e.g., Barnes*, 501 U. S., at 566–572 (applying *O'Brien* to evaluate the application of a general nudity ban to nude dancing); *Clark*, 468 U. S., at 293 (applying *O'Brien* to evaluate the application of a general camping ban to a demonstration in the park). Here, however, Colorado would not be punishing Phillips if he refused to create any custom wedding cakes; it is punishing him because he refuses to create custom wedding cakes that express approval of same-sex marriage. In cases like this one, our precedents demand "'the most exacting scrutiny.'" *Johnson*, 491 U. S., at 412; accord, *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 28 (2010).

The Court of Appeals did not address whether Colorado's law survives strict scrutiny, and I will not do so in the first instance. There is an obvious flaw, however, with

———————

[4] "[A] government regulation [of expressive conduct] is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968).

one of the asserted justifications for Colorado's law.  According to the individual respondents, Colorado can compel Phillips' speech to prevent him from "'denigrat[ing] the dignity'" of same-sex couples, "'assert[ing] [their] inferiority,'" and subjecting them to "'humiliation, frustration, and embarrassment.'"  Brief for Respondents Craig et al. 39 (quoting *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 142 (1994); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 292 (1964) (Goldberg, J., concurring)).  These justifications are completely foreign to our free-speech jurisprudence.

States cannot punish protected speech because some group finds it offensive, hurtful, stigmatic, unreasonable, or undignified.  "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Johnson*, *supra*, at 414.  A contrary rule would allow the government to stamp out virtually any speech at will.  See *Morse* v. *Frederick*, 551 U. S. 393, 409 (2007) ("After all, much political and religious speech might be perceived as offensive to some").  As the Court reiterates today, "it is not . . . the role of the State or its officials to prescribe what shall be offensive."  *Ante,* at 16.  "'Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.'"  *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 55 (1988); accord, *Johnson*, *supra*, at 408–409.  If the only reason a public-accommodations law regulates speech is "to produce a society free of . . . biases" against the protected groups, that purpose is "decidedly fatal" to the law's constitutionality, "for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression."  *Hurley*, 515 U. S., at 578–579; see also *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000) ("Where the designed benefit of a content-based speech

restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails"). "[A] speech burden based on audience reactions is simply government hostility . . . in a different guise." *Matal* v. *Tam*, 582 U. S. ___, ___ (2017) (KENNEDY, J., concurring in part and concurring in judgment) (slip op., at 4).

Consider what Phillips actually said to the individual respondents in this case. After sitting down with them for a consultation, Phillips told the couple, "'I'll make your birthday cakes, shower cakes, sell you cookies and brownies, I just don't make cakes for same sex weddings.'" App. 168. It is hard to see how this statement stigmatizes gays and lesbians more than blocking them from marching in a city parade, dismissing them from the Boy Scouts, or subjecting them to signs that say "God Hates Fags"—all of which this Court has deemed protected by the First Amendment. See *Hurley*, *supra*, at 574–575; *Dale*, 530 U. S., at 644; *Snyder* v. *Phelps*, 562 U. S. 443, 448 (2011). Moreover, it is also hard to see how Phillips' statement is worse than the racist, demeaning, and even threatening speech toward blacks that this Court has tolerated in previous decisions. Concerns about "dignity" and "stigma" did not carry the day when this Court affirmed the right of white supremacists to burn a 25-foot cross, *Virginia* v. *Black*, 538 U. S. 343 (2003); conduct a rally on Martin Luther King Jr.'s birthday, *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123 (1992); or circulate a film featuring hooded Klan members who were brandishing weapons and threatening to "'Bury the niggers,'" *Brandenburg* v. *Ohio*, 395 U. S. 444, 446, n. 1 (1969) (*per curiam*).

Nor does the fact that this Court has now decided *Obergefell* v. *Hodges*, 576 U. S. ___ (2015), somehow diminish Phillips' right to free speech. "It is one thing . . . to conclude that the Constitution protects a right to same-sex marriage; it is something else to portray everyone who does not share [that view] as bigoted" and unentitled to

express a different view. *Id.*, at ___ (ROBERTS, C. J., dissenting) (slip op., at 29). This Court is not an authority on matters of conscience, and its decisions can (and often should) be criticized. The First Amendment gives individuals the right to disagree about the correctness of *Obergefell* and the morality of same-sex marriage. *Obergefell* itself emphasized that the traditional understanding of marriage "long has been held—and continues to be held—in good faith by reasonable and sincere people here and throughout the world." *Id.*, at ___ (majority opinion) (slip op., at 4). If Phillips' continued adherence to that understanding makes him a minority after *Obergefell*, that is all the more reason to insist that his speech be protected. See *Dale*, *supra*, at 660 ("[T]he fact that [the social acceptance of homosexuality] may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view").

\* \* \*

In *Obergefell*, I warned that the Court's decision would "inevitabl[y] . . . come into conflict" with religious liberty, "as individuals . . . are confronted with demands to participate in and endorse civil marriages between same-sex couples." 576 U. S., at ___ (dissenting opinion) (slip op., at 15). This case proves that the conflict has already emerged. Because the Court's decision vindicates Phillips' right to free exercise, it seems that religious liberty has lived to fight another day. But, in future cases, the freedom of speech could be essential to preventing *Obergefell* from being used to "stamp out every vestige of dissent" and "vilify Americans who are unwilling to assent to the new orthodoxy." *Id.,* at ___ (ALITO, J., dissenting) (slip op., at 6). If that freedom is to maintain its vitality, reasoning like the Colorado Court of Appeals' must be rejected.

# SUPREME COURT OF THE UNITED STATES

No. 16–111

MASTERPIECE CAKESHOP, LTD., ET AL., PETITIONERS
*v.* COLORADO CIVIL RIGHTS COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
COLORADO

[June 4, 2018]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR
joins, dissenting.

There is much in the Court's opinion with which I agree.
"[I]t is a general rule that [religious and philosophical]
objections do not allow business owners and other actors
in the economy and in society to deny protected persons
equal access to goods and services under a neutral and
generally applicable public accommodations law." *Ante,* at
9. "Colorado law can protect gay persons, just as it can
protect other classes of individuals, in acquiring whatever
products and services they choose on the same terms and
conditions as are offered to other members of the public."
*Ante,* at 10. "[P]urveyors of goods and services who object
to gay marriages for moral and religious reasons [may not]
put up signs saying 'no goods or services will be sold if
they will be used for gay marriages.'" *Ante,* at 12. Gay
persons may be spared from "indignities when they seek
goods and services in an open market." *Ante,* at 18.[1]　I

—————

[1] As JUSTICE THOMAS observes, the Court does not hold that wedding
cakes are speech or expression entitled to First Amendment protection.
See *ante,* at 1 (opinion concurring in part and concurring in judgment).
Nor could it, consistent with our First Amendment precedents. JUSTICE
THOMAS acknowledges that for conduct to constitute protected expres-
sion, the conduct must be reasonably understood by an observer to be
communicative. *Ante,* at 4 (citing *Clark* v. *Community for Creative*

strongly disagree, however, with the Court's conclusion that Craig and Mullins should lose this case. All of the above-quoted statements point in the opposite direction.

The Court concludes that "Phillips' religious objection was not considered with the neutrality that the Free Exercise Clause requires." *Ante,* at 17. This conclusion rests on evidence said to show the Colorado Civil Rights Commission's (Commission) hostility to religion. Hostility is discernible, the Court maintains, from the asserted "disparate consideration of Phillips' case compared to the cases of" three other bakers who refused to make cakes requested by William Jack, an *amicus* here. *Ante,* at 18. The Court also finds hostility in statements made at two public hearings on Phillips' appeal to the Commission. *Ante,* at 12–14. The different outcomes the Court features

———————

*Non-Violence*, 468 U. S. 288, 294 (1984)). The record in this case is replete with Jack Phillips' own views on the messages he believes his cakes convey. See *ante,* at 5–6 (THOMAS, J., concurring in part and concurring in judgment) (describing how Phillips "considers" and "sees" his work). But Phillips submitted no evidence showing that an objective observer understands a wedding cake to convey a message, much less that the observer understands the message to be the baker's, rather than the marrying couple's. Indeed, some in the wedding industry could not explain what message, or whose, a wedding cake conveys. See Charsley, Interpretation and Custom: The Case of the Wedding Cake, 22 Man 93, 100–101 (1987) (no explanation of wedding cakes' symbolism was forthcoming "even amongst those who might be expected to be the experts"); *id.,* at 104–105 (the cake cutting tradition might signify "the bride and groom . . . as appropriating the cake" from the bride's parents). And Phillips points to no case in which this Court has suggested the provision of a baked good might be expressive conduct. Cf. *ante,* at 7, n. 2 (THOMAS, J., concurring in part and concurring in judgment); *Hurley* v. *Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 568–579 (1995) (citing previous cases recognizing parades to be expressive); *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 565 (1991) (noting precedents suggesting nude dancing is expressive conduct); *Spence* v. *Washington*, 418 U. S. 405, 410 (1974) (observing the Court's decades-long recognition of the symbolism of flags).

do not evidence hostility to religion of the kind we have previously held to signal a free-exercise violation, nor do the comments by one or two members of one of the four decisionmaking entities considering this case justify reversing the judgment below.

I

On March 13, 2014—approximately three months after the ALJ ruled in favor of the same-sex couple, Craig and Mullins, and two months before the Commission heard Phillips' appeal from that decision—William Jack visited three Colorado bakeries. His visits followed a similar pattern. He requested two cakes

> "made to resemble an open Bible. He also requested that each cake be decorated with Biblical verses. [He] requested that one of the cakes include an image of two groomsmen, holding hands, with a red 'X' over the image. On one cake, he requested [on] one side[,] . . . 'God hates sin. Psalm 45:7' and on the opposite side of the cake 'Homosexuality is a detestable sin. Leviticus 18:2.' On the second cake, [the one] with the image of the two groomsmen covered by a red 'X' [Jack] requested [these words]: 'God loves sinners' and on the other side 'While we were yet sinners Christ died for us. Romans 5:8.'" App. to Pet. for Cert. 319a; see *id.,* at 300a, 310a.

In contrast to Jack, Craig and Mullins simply requested a wedding cake: They mentioned no message or anything else distinguishing the cake they wanted to buy from any other wedding cake Phillips would have sold.

One bakery told Jack it would make cakes in the shape of Bibles, but would not decorate them with the requested messages; the owner told Jack her bakery "does not discriminate" and "accept[s] all humans." *Id.*, at 301a (internal quotation marks omitted). The second bakery owner

told Jack he "had done open Bibles and books many times
and that they look amazing," but declined to make the
specific cakes Jack described because the baker regarded
the messages as "hateful." *Id.*, at 310a (internal quotation
marks omitted). The third bakery, according to Jack, said
it would bake the cakes, but would not include the re-
quested message. *Id.*, at 319a.[2]

Jack filed charges against each bakery with the Colo-
rado Civil Rights Division (Division). The Division found no
probable cause to support Jack's claims of unequal treat-
ment and denial of goods or services based on his Chris-
tian religious beliefs. *Id.*, at 297a, 307a, 316a. In this
regard, the Division observed that the bakeries regularly
produced cakes and other baked goods with Christian
symbols and had denied other customer requests for de-
signs demeaning people whose dignity the Colorado Anti-
discrimination Act (CADA) protects. See *id.*, at 305a,
314a, 324a. The Commission summarily affirmed the
Division's no-probable-cause finding. See *id.,* at 326a–
331a.

The Court concludes that "the Commission's considera-
tion of Phillips' religious objection did not accord with its
treatment of [the other bakers'] objections." *Ante,* at 15.
See also *ante,* at 5–7 (GORSUCH, J., concurring). But the
cases the Court aligns are hardly comparable. The bakers
would have refused to make a cake with Jack's requested
message for any customer, regardless of his or her reli-
gion. And the bakers visited by Jack would have sold him
any baked goods they would have sold anyone else. The
bakeries' refusal to make Jack cakes of a kind they would
not make for any customer scarcely resembles Phillips'
refusal to serve Craig and Mullins: Phillips would *not* sell

---

[2] The record provides no ideological explanation for the bakeries' re-
fusals. Cf. *ante,* at 1–2, 9, 11 (GORSUCH, J., concurring) (describing
Jack's requests as offensive to the bakers' "secular" convictions).

to Craig and Mullins, for no reason other than their sexual orientation, a cake of the kind he regularly sold to others. When a couple contacts a bakery for a wedding cake, the product they are seeking is a cake celebrating *their* wedding—not a cake celebrating heterosexual weddings or same-sex weddings—and that is the service Craig and Mullins were denied. Cf. *ante,* at 3–4, 9–10 (GORSUCH, J., concurring). Colorado, the Court does not gainsay, prohibits precisely the discrimination Craig and Mullins encountered. See *supra,* at 1. Jack, on the other hand, suffered no service refusal on the basis of his religion or any other protected characteristic. He was treated as any other customer would have been treated—no better, no worse.[3]

The fact that Phillips might sell other cakes and cookies to gay and lesbian customers[4] was irrelevant to the issue Craig and Mullins' case presented. What matters is that Phillips would not provide a good or service to a same-sex

——————

[3] JUSTICE GORSUCH argues that the situations "share all legally salient features." *Ante,* at 4 (concurring opinion). But what critically differentiates them is the role the customer's "statutorily protected trait," *ibid.*, played in the denial of service. Change Craig and Mullins' sexual orientation (or sex), and Phillips would have provided the cake. Change Jack's religion, and the bakers would have been no more willing to comply with his request. The bakers' objections to Jack's cakes had nothing to do with "religious opposition to same-sex weddings." *Ante,* at 6 (GORSUCH, J., concurring). Instead, the bakers simply refused to make cakes bearing statements demeaning to people protected by CADA. With respect to Jack's second cake, in particular, where he requested an image of two groomsmen covered by a red "X" and the lines "God loves sinners" and "While we were yet sinners Christ died for us," the bakers gave not the slightest indication that religious words, rather than the demeaning image, prompted the objection. See *supra,* at 3. Phillips did, therefore, discriminate *because of* sexual orientation; the other bakers did not discriminate *because of* religious belief; and the Commission properly found discrimination in one case but not the other. Cf. *ante,* at 4–6 (GORSUCH, J., concurring).

[4] But see *ante,* at 7 (majority opinion) (acknowledging that Phillips refused to sell to a lesbian couple cupcakes for a celebration of their union).

couple that he would provide to a heterosexual couple. In contrast, the other bakeries' sale of other goods to Christian customers was relevant: It shows that there were no goods the bakeries would sell to a non-Christian customer that they would refuse to sell to a Christian customer. Cf. *ante,* at 15.

Nor was the Colorado Court of Appeals' "difference in treatment of these two instances . . . based on the government's own assessment of offensiveness." *Ante,* at 16. Phillips declined to make a cake he found offensive where the offensiveness of the product was determined solely by the identity of the customer requesting it. The three other bakeries declined to make cakes where their objection to the product was due to the demeaning message the requested product would literally display. As the Court recognizes, a refusal "to design a special cake with words or images . . . might be different from a refusal to sell any cake at all." *Ante,* at 2.[5] The Colorado Court of Appeals did not distinguish Phillips and the other three bakeries based simply on its or the Division's finding that messages

———————

[5] The Court undermines this observation when later asserting that the treatment of Phillips, as compared with the treatment of the other three bakeries, "could reasonably be interpreted as being inconsistent as to the question of whether speech is involved." *Ante,* at 15. But recall that, while Jack requested cakes with particular text inscribed, Craig and Mullins were refused the sale of any wedding cake at all. They were turned away before any specific cake design could be discussed. (It appears that Phillips rarely, if ever, produces wedding cakes with words on them—or at least does not advertise such cakes. See Masterpiece Cakeshop, Wedding, http://www.masterpiececakes.com/wedding-cakes (as last visited June 1, 2018) (gallery with 31 wedding cake images, none of which exhibits words).) The Division and the Court of Appeals could rationally and lawfully distinguish between a case involving disparaging text and images and a case involving a wedding cake of unspecified design. The distinction is not between a cake with text and one without, see *ante,* at 8–9 (GORSUCH, J., concurring); it is between a cake with a particular design and one whose form was never even discussed.

in the cakes Jack requested were offensive while any message in a cake for Craig and Mullins was not. The Colorado court distinguished the cases on the ground that Craig and Mullins were denied service based on an aspect of their identity that the State chose to grant vigorous protection from discrimination. See App. to Pet. for Cert. 20a, n. 8 ("The Division found that the bakeries did not refuse [Jack's] request because of his creed, but rather because of the offensive nature of the requested message. . . . [T]here was no evidence that the bakeries based their decisions on [Jack's] religion . . . [whereas Phillips] discriminat[ed] on the basis of sexual orientation."). I do not read the Court to suggest that the Colorado Legislature's decision to include certain protected characteristics in CADA is an impermissible government prescription of what is and is not offensive. Cf. *ante,* at 9–10. To repeat, the Court affirms that "Colorado law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public." *Ante,* at 10.

## II

Statements made at the Commission's public hearings on Phillips' case provide no firmer support for the Court's holding today. Whatever one may think of the statements in historical context, I see no reason why the comments of one or two Commissioners should be taken to overcome Phillips' refusal to sell a wedding cake to Craig and Mullins. The proceedings involved several layers of independent decisionmaking, of which the Commission was but one. See App. to Pet. for Cert. 5a–6a. First, the Division had to find probable cause that Phillips violated CADA. Second, the ALJ entertained the parties' cross-motions for summary judgment. Third, the Commission heard Phillips' appeal. Fourth, after the Commission's ruling, the Colo-

rado Court of Appeals considered the case *de novo*.  What prejudice infected the determinations of the adjudicators in the case before and after the Commission?  The Court does not say.  Phillips' case is thus far removed from the only precedent upon which the Court relies, *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520 (1993), where the government action that violated a principle of religious neutrality implicated a sole decisionmaking body, the city council, see *id.,* at 526–528.

\*     \*     \*

For the reasons stated, sensible application of CADA to a refusal to sell any wedding cake to a gay couple should occasion affirmance of the Colorado Court of Appeals' judgment.  I would so rule.