*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re PILAND, Minors.

FOR PUBLICATION
April 15, 2021
9:00 a.m.

No. 353436
Ingham Circuit Court
Family Division
LC Nos. 17-000591-NA;
         17-000592-NA;
         18-000996-NA

Before: CAMERON, P.J., and K. F. KELLY and M. J. KELLY, JJ.

M. J. KELLY, J.

Respondents appeal as of right the orders terminating their parental rights to their children, MP, JP, and VP, under MCL 712A.19b(3)(b)(*i*) and (j). Respondents argue that the trial court erred by denying their request for a jury instruction based on MCL 722.634 in the adjudicative phase of a child protective proceeding. Because a rational view of the evidence supported giving the instruction, the trial court erred by denying the request for the instruction. We reverse and remand for a new adjudication trial.

## I. FACTS

On February 6, 2017, respondents' third child, AP, was born at their home with the assistance of a midwife. Less than 20 hours later, on February 7, 2017, the midwife observed that AP was showing signs of jaundice on her face and chest.[1] Concerned about the presence and severity of jaundice within 24 hours of AP's birth, the midwife strongly emphasized to respondent-mother that the baby should be seen by a doctor. Respondent-mother refused, telling the midwife that "God makes no mistakes, our baby is fine." Respondent-mother conferred with respondent-father and, together, they declined to seek medical care for AP. Multiple witnesses, including

---

[1] According to the testimony, jaundice is caused by elevated bilirubin levels, and bilirubin is a byproduct created by the breaking down of hemoglobin.

respondents, testified that respondents' religious beliefs precluded them from seeking manmade medical care for themselves or for their children. Instead, respondents relied on faith-based or divine healing.[2]

The next day, February 8, 2017, respondent-mother told the midwife that AP was "darkening," but she declined a scheduled follow-up appointment from the midwife. Respondent-mother explained that she and respondent-father had decided to stand on faith for AP's healing. AP's condition continued to worsen. She was lethargic, had poor suck, did not eat for approximately 16 hours, and her skin and eyes showed signs of jaundice. Respondents were concerned, but the night before her death, at 4:30 a.m., AP finally drank some milk. She spit up bloody phlegm, and had five bowel movements. Respondent-mother believed that the yellow in her eyes had lessened and that her condition was improving. The maternal grandmother held AP in the hours before her death. She stated that at the time, AP seemed to struggle a little to breathe. She also recounted that AP was tightening her hands and feet, which she now believes were signs that AP was having seizures.[3] The maternal grandmother was very concerned, but she did not call 9-1-1 because she thought respondent-father would be extremely angry. Instead, she left the home to get groceries, called the midwife's assistant to report AP's condition, and then returned to the home. When she arrived, respondent-mother told her that AP was "showing signs of lifelessness."

Respondents did not call emergency services when they discovered AP was not breathing. Instead, respondent-father placed his hands on her chest and started praying. Later, he contacted various friends and family whom he believed shared similar religious beliefs. They came to the home and prayed with him and respondent-mother for several hours. Nearly nine hours after AP's death, respondent-mother's brother called law enforcement and Child Protective Services (CPS), who then arrived.

The CPS investigation ultimately resulted in the older two children being removed from the home. And, when VP was born approximately 18 months later, she was also removed from respondents' care. Throughout the case, respondents have maintained their belief that AP will be resurrected and they shared that belief with their still living children, all of whom were under the age of seven. Additionally, the record reflects that throughout the case, respondents continued to object to their children receiving medical care. One child went to the hospital for an apparent allergic reaction. He was prescribed an EpiPen, which respondents adamantly stated that they would not rely on even if he were showing signs of an allergic reaction. When another child broke his foot, respondent-mother told him that he did not have a broken bone because if he believed in and obeyed God, his bones would not break. Respondents also objected to the lifesaving medical

---

[2] At the time of AP's death, respondents were part of two religious groups, Free Saints Assembly and Faith Tech Ministries. They testified that both groups supported divine healing, but noted that neither group prohibited a person from seeking manmade medical care. Rather, it was up to each individual to determine whether they would rely solely on divine healing or would utilize a combination of manmade and divine healing.

[3] An expert witness testified that a tightening of the hands or feet is consistent with the signs of a seizure in a baby.

treatment that VP received after she was removed from respondents care. The record reflects that, like AP, she was jaundiced within 24 hours of her birth. She was diagnosed with hemolytic disease of the infant.[4] To treat it, she required seven days of phototherapy and required an exchange transfusion. Without the treatment she would have died. Even knowing that, respondents maintained that they would not have sought medical treatment for her. At trial, respondents testified that under no circumstances would they seek manmade medical care for their children.

## II. JURY INSTRUCTIONS

### A. STANDARD OF REVIEW

Respondents argue that the trial court erred by not instructing the jury in accordance with MCL 722.634. Claims of instructional error involve questions of law, which this Court reviews de novo. *People v Craft*, 325 Mich App 598, 604; 927 NW2d 708 (2018). A trial court's determination regarding whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled decisions." *Craft*, 325 Mich App at 604. "A trial court necessarily abuses its discretion when it makes an error of law." *People v Waterstone*, 296 Mich App 121, 132; 818 NW2d 432 (2012). Questions of statutory interpretation are reviewed de novo. *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016).

### B. ANALYSIS

MCL 722.634 provides a limited, religious-based defense for a parent or guardian who does not provide a child with a specified medical treatment. In relevant part, the statute states that "[a] parent or guardian legitimately practicing his religious beliefs who thereby does not provide specified medical treatment for a child, for that reason alone shall not be considered a negligent parent or guardian." Respondents first requested an instruction based on this statute before the adjudication trial. The trial court denied the request, and respondents appealed to this Court. In our earlier decision, this Court held that MCL 722.634 applies to child protective proceedings and

---

[4] Dr. Sarah Brown, an expert in child abuse pediatrics, testified that although jaundice is common in babies, if it develops within the first 24 hours after birth, it is indicative of serious medical problems that should prompt further medical investigation. Relevant to this case, based upon AP's symptoms, respondent-mother's blood type, and the medical history of VP, Dr. Brown opined that AP's jaundice was also caused by hemolytic disease of the infant. A baby with such a disease would experience hyperbilirubinemia, which Dr. Brown explained is caused by excessively high levels of bilirubin in a baby's blood. The symptoms of hyperbilirubinemia include, yellow color, sleepiness, lack of appetite, and, as the condition worsens, lethargy, poor muscle tone, lack of coordination, and poor suck. She stated that in the hours and minutes before death, a baby with hyperbilirubinemia would experience seizures, but that the actual event leading to death would be when the respiratory drive is no longer present and the baby stops breathing. Dr. Brown maintained that if AP had received medical treatment, even if it had been sought in the hours before her death, there would have been an 80 to 90 % survival rate.

that the trial court must provide an instruction reflecting the statutory language. *In re Piland*, 324 Mich App 337, 345; 920 NW2d 403 (2018) (*Piland I*), vacated in part *In re Piland*, 503 Mich 1032 (2019) (*Piland II*). Our Supreme Court affirmed that MCL 722.634 applied to child protective proceedings, but vacated the part of our opinion directing the trial court to instruct the jury in accordance with the statute. *Piland II*, 503 Mich at 1032. The Court explained that the directive to so instruct the jury "was premature, because the respondents' entitlement to a jury instruction based on MCL 722.634 depends on the evidence that is ultimately presented at the respondents' adjudication trial." *Id.* Consequently, the Court remanded to the trial court for further proceedings, ordering the trial court to "provide an instruction that is consistent with MCL 722.634 if such an instruction is requested by the respondents and if a rational view of the evidence supports the conclusion that the failure to provide medical treatment was based on the respondents' legitimate practice of their religious beliefs." *Id.*

On remand, following the presentation of the proofs at the adjudication trial, respondents requested such an instruction, but the trial court denied the request, finding that a rational view of the evidence did not support giving the instruction. In finding no rational basis for giving the instruction, the trial court focused on the meaning of the word "legitimately." The court reasoned:

> Now, the Court believes that *for a religious belief to be legitimate*, it must conform to the law or rules. . . . [T]here needs to be at least some recognized standards or acceptable, uh—recognized or acceptable standards that we are gaging those relief—beliefs against to determine whether or not *those beliefs are legitimate*.

> The legislature, in my estimation, did not intend to provide this exception to all strongly held beliefs. They also didn't intend to provide this exception to all strongly held religious beliefs, but *only those beliefs that were in accordance with practicing a religion, uh, or religious rules or laws, or in—in conformance with acceptable religious standards, and acceptable religious practices*.

> Individual acts of faith or following subjected—subjective individualized beliefs *do not constitute legitimately practicing your religious beliefs*. . . .

> * * *

> The Court is not, um, ruling in this instance that the [respondents'] faith is not heartfelt or dis—dishonest. Uh, they have been steadfast an—and earnest in their beliefs. However, *those beliefs are not supported by any law, doctrine, or cannon of any religion. They are religious in nature, but that does not rise to the level of a legitimate practicing of a religious belief*.

> Their own assembly, or sect, or—or group, made it clear that medical treatment is not prohibited by the tenants of their faith. And the [respondents] have taken scripture and have personally interpreted in this way, which is not covered by MCL 722.634.

> The Court, therefore, believes that the proffered instruction based upon the statute is, therefore, not warranted. [Emphasis added.]

-4-

Subsequently, in its order terminating respondents' parental rights, the trial court again stated that the jury instruction was not warranted because respondents' decision to not provide AP with treatment was based on religious beliefs, but those beliefs "were not in accordance with the legitimate practicing of any religions [sic] laws, rules or standards." In doing so, the court turned to the dictionary definition of the word "legitimate," noting that the *American Heritage Dictionary* (4th ed) defined it as "being in compliance with law" or "being in accordance with established or accepted patterns or standards."

We conclude that the trial court's view that the word "legitimately" means that a parent or guardian's religious beliefs must be legitimate is unconstitutional and must be rejected. When interpreting a statute, we "must presume a statute is constitutional and construe it as such, unless the only proper construction renders the statute unconstitutional." *Grebner v State*, 480 Mich 939, 940; 744 NW2d 123 (2007) (quotation marks and citation omitted). Therefore, "assuming that there are two reasonable ways of interpreting [a statute]—one that renders the statute unconstitutional and one that renders it constitutional—we should choose the interpretation that renders the statute constitutional." *People v Skinner*, 502 Mich 89, 110-111; 917 NW2d 292 (2018).

The trial court's interpretation of the word "legitimately," as used in MCL 722.634, is that the religious beliefs being practiced must be legitimate. And, that, in order to be legitimate, those beliefs had to be part of the doctrine or tenants of a religion as opposed to a parent or guardian's subjective interpretation of scriptures.[5] The trial court's interpretation, however, renders the statute unconstitutional. It is well-established that "government has no role in deciding or even suggesting whether the religious ground" for a person's actions "is legitimate or illegitimate." *Masterpiece Cakeshop, Ltd v Colorado Civil Rights Com'n*, ___ US ___, ___; 138 S Ct 1719, 1731; 201 L Ed 2d 35 (2018). Instead, in order "to respect the [United States] Constitution's guarantee of free exercise [of religion], [the government] cannot . . . act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* See also *Church of the Kukumi B abalu Aye, Inc v City of Hialeah*, 508 US 520, 531; 113 S Ct 2217; 124 L Ed 2d 472 (1993) (stating that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). As our Supreme Court explained in *People v DeJonge*, 442 Mich 266, 282; 501 NW2d 127 (1993):

> This Court must accept a worshiper's good-faith characterization that its activity is grounded in religious belief because "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v Comm'r of Internal*

---

[5] The factual basis for the court's finding is not entirely consistent with the record testimony. For instance, respondent-father admitted that some people involved with Free Saints Assembly rejected manmade medical care and some did not and that neither Faith Tech Ministries nor Free Saints Assembly had a tenet rejecting medical treatment. Instead, it was left to each person to make an individual choice. Thus, this was not something that was forbidden by their religious organizations, rather it was something that was permissible and recognized by the groups—at least prior to AP's death—as an acceptable option for healing.

*Revenue*, 490 US 680, 699; 109 S Ct 2136; 104 L Ed 2d 766 (1989). This must be so because "[m]en may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others." *[US v] Ballard*, 322 US [78,] 86[; 64 S Ct 882; 88 L Ed 1148].

Nor is religious orthodoxy necessary to obtain the protection of the Free Exercise Clause. Religious belief and conduct need not be endorsed or mandated by a religious organization to be protected. [*Mich Dep't of Social Servs v] Emmanuel Baptist Preschool*, 434 Mich [380,] 392[; 455 NW2d 1 (1990)] (CAVANAGH, J., concurring). Indeed, because popular religious beliefs are rarely threatened by elected legislators, the Free Exercise Clause's major benefactors are religious minorities or dissidents whose beliefs and worship are suppressed or shunned by the majority. To hold otherwise would be to deny that "Religion . . . must be left to the conviction and conscience of every man. . . ." [Footnotes omitted.]

See also *Frazee v Illinois Dep't of Employment Security*, 489 US 829, 834-835; 109 S Ct 1514; 103 L Ed 2d 914 (1989) (noting that "the Free Exercise Clause does not demand adherence to a tenet or dogma of an established religious sect," and rejecting as improper the state's contention that, although the appellant's conviction was religious, it was "inadequate because it was not claimed to represent a tenet of a religious organization of which he was a member."). As is clear from the above authority, the trial court improperly held that respondents' religious beliefs lacked legitimacy solely because their beliefs were not represented by a tenet or rule of a religious organization.

We also hold that the trial court's interpretation is inconsistent with the statutory language. As we explained in our prior opinion,

Analysis of the Legislature's intent with respect to MCL 722.634 requires statutory interpretation. "The goal of statutory interpretation is to give effect to the Legislature's intent as determined from the language of the statute." *Bukowski v Detroit*, 478 Mich 268, 273; 732 NW2d 75 (2007). The words in the statute are interpreted in "light of their ordinary meaning and their context within the statute and read . . . harmoniously to give effect to the statute as a whole." *Johnson v Recca*, 492 Mich 169, 177, 821 NW2d 520 (2012) (quotation marks and citation omitted). In addition to a phrase's plain meaning, courts must consider "its placement and purpose in the statutory scheme." *US Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 13, 795 NW2d 101 (2009) (quotation marks and citation omitted). [*Piland I*, 324 Mich App at 344.]

MCL 722.634 states that "[a] parent or guardian legitimately practicing his religious beliefs who thereby does not provide specified medical treatment for a child, for that reason alone shall not be considered a negligent parent or guardian." "Legitimately" is not defined by the statute. Undefined words are given their plain meaning, which may be ascertained by reference to a dictionary. *Johnson v Pastoriza*, 491 Mich 417, 436; 818 NW2d 279 (2012). "Legitimately" is the adverb form of the adjective "legitimate." *Merriam-Webster's Collegiate Dictionary* (11th ed).

The word "legitimate" has more than one meaning. According to *Merriam-Webster's Collegiate Dictionary* (11th ed), "legitimate" is defined as follows:

> **1 a :** lawfully begotten . . . **2 :** being exactly as proposed : neither spurious or false . . . **3 a :** accordant with law or established legal forms or requirements < a ~ government **b :** ruling by or based on the strict principle of hereditary right < a ~ king **4 :** conforming to recognized principles or accepted rules and standards . . . **5 :** relating to plays acted by professional actors but not including revues, burlesque, or some forms of musical comedy.

The trial court relied on the third definition because the court was considering the meaning of the word "legitimate" as it would be used to modify religious beliefs formed by association with a religious organization. That makes sense as that definition clearly relates to the structure of organizations, such as governments and monarchies. However, the word "legitimately" modifies the word "practicing." Therefore, by interpreting the word in connection with "religious beliefs" as opposed to the practice of religious beliefs, the trial court misconstrued the statute.

The correct inquiry requires consideration of what it means to be "legitimately practicing" a religious belief. In relevant part, to "practice" is to "carry out, apply < ~ what you preach >" *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, the only definition of "legitimate" that makes sense in the context that it is used is the second definition, i.e., "being exactly as proposed : neither spurious or false." Together, then, in order to be "legitimately practicing" his or her religious beliefs, the parent or guardian must have been actually practicing his or her religious beliefs at the time that he or she did not provide his or her child with specified medical treatment. And, if a rational view of the evidence supports that finding, an instruction in accordance with MCL 722.634 is required.

The record is replete with testimony showing that respondents were actually, i.e., legitimately, practicing their religious beliefs when they did not seek medical treatment for AP. Multiple witnesses testified that respondents had long been advocates of divine healing. For example, the maternal grandmother testified she had "no doubt" that respondents believed what they professed about divine healing, and she noted that respondent-mother had held those beliefs for approximately ten years before AP's death. The maternal grandmother also stated that none of respondents' children had received medical care because of respondents' religious beliefs. The oldest child was approximately six years old, which shows that for six years before AP's death, respondents held and practiced the same religious beliefs that they were practicing at the time of her death. Respondents also spoke at a divine healing conference in 2016, and respondent-mother recounted times that she had stood on faith of her healing and had been healed without any manmade medical treatment. The speakers at the conference held varied beliefs on divine healing, with some rejecting all manmade medicine and others allowing for a blend of divine healing and medical intervention. Also, respondent-mother's brother testified that before AP's death he had concerns that respondents' religious beliefs would be taken to the extreme to the detriment of their children, which shows that he too was aware of those beliefs.

More evidence exists to show that during AP's short life, respondents were actually relying on divine healing. The midwife's testimony shows that respondent-mother repeatedly told her that they were going to stand in faith for AP and would not take her for medical evaluation. The

maternal grandmother similarly recounted that respondent-mother refused medical treatment for AP, stating that she would instead pray for her. She heard respondent-mother listening to sermons with AP and praying. Respondents also both testified—and have stated consistently throughout the case—that they relied on divine healing for AP.

After AP's death, respondents made no effort to conceal what happened. They did not call 9-1-1. Instead, they called what they described as likeminded friends and family, including the pastor of the Free Saints Assembly.[6] The individuals who arrived did not call emergency services. They, like respondents, prayed in the bedroom for AP. When emergency services did arrive, respondent-mother cited religious beliefs as the reason they did not call 9-1-1, and respondents freely spoke with CPS, law enforcement, and others to explain that their actions in not seeking medical care were because of their religious beliefs. A witness for CPS testified that respondents never gave her any reason to believe that their religious beliefs were less than sincere. And, following the presentation of the proofs, the trial court expressly stated that respondents' faith was not "dishonest," and that respondents had been both steadfast and earnest in their beliefs.

Given the substantial evidence showing that respondent's were legitimately practicing their religious beliefs when they did not seek medical treatment for AP, the trial court erred by not instructing the jury in accordance with MCL 722.634.[7] Because the Supreme Court ordered the jury to be instructed in accordance with MCL 722.634 if (1) respondents requested such an instruction, and (2) if a rational view of the evidence supported the conclusion that respondents' failure to provide medical treatment was based on their legitimate practice of their religious beliefs, the trial court was required to give the jury the instruction.

As an alternative basis for its decision denying the request for a jury instruction based on MCL 722.634, the trial court sua sponte held that the statute was unconstitutional because it impermissibly interfered with AP's constitutional right to life. We disagree. Notably, MCL 722.634 does not preclude consideration of the parent or guardian's decision to not provide

---

[6] Respondents did not believe that their pastor was ordained by a religious organization. However, the fact that they called a man they regarded as their pastor is evidence that they were seeking spiritual aid following AP's death.

[7] By so holding, we are not depriving the jury from making its own determination as to whether respondents were legitimately practicing their religious beliefs. The record plainly indicates that they sought medical treatment for themselves, including once when respondent-father went to urgent care to have glass shards removed from his arm and to have the injury "glued" and bandaged. Both respondents also rely on prescription eyewear. Finally, for the births of their first three children, respondents sought and consented to treatment by a midwife. Although they rejected some treatment options, they consented to others, including routine checks of respondent-mother's blood pressure and evaluation of the fetal heartbeat. They also had both of their older children circumcised by a medical professional. A jury could very well conclude that respondents' decision to provide themselves with medical care, but to deny it to their children is evidence that their religious beliefs were not being legitimately practiced. The court and the lawyers, however, should take care not to suggest that the legitimacy of respondents' religious beliefs is a matter for consideration by the jury.

specified medical treatment. Instead, the statute only precludes that from being the *only*, i.e., the sole, reason for determining that the parent or guardian is negligent. Therefore, the jury can consider the decision or failure to provide specified medical treatment in connection with other evidence showing that the parent or guardian is a negligent parent or guardian. Additionally, MCL 722.634 expressly states that a court is not precluded "from ordering the provision of medical services or nonmedical remedial services recognized by state law to a child where the child's health requires it nor does it abrogate the responsibility of a person required to report child abuse or neglect." Thus, although the statute offers some protection to a parent or guardian legitimately practicing his or her religious beliefs, it nevertheless balances the state's need to intercede to protect the child's health. Consequently, the statute only precludes consideration of the failure to provide medical support from being the *only* consideration, permits the state to intervene to protect the child's health, and it does not exempt mandatory reporters from reporting abuse or neglect, so the child's health and safety is not unprotected. Again, MCL 722.634 is not an absolute exception. A jury instructed in accordance with MCL 722.634 is not required to return a finding of no jurisdiction.

Having concluded that the jury instruction should have been given, we must next consider whether the failure to give it is reversible error. Petitioner correctly notes that MCL 722.634 creates a limited exemption to a finding that a parent or guardian is a *negligent* parent or guardian. There are many grounds for a court to take jurisdiction over a child, and not all of them are dependent upon a finding that the parent or guardian is negligent. For instance, under MCL 712A(b)(2), jurisdiction is proper over a child "[w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent . . . is an unfit place for the juvenile to live in . . ." As only one of the options relates to a negligent parent, a jury could find grounds for jurisdiction if it found that the minor children's home was an unfit place for them to live in because of cruelty, drunkenness, criminality, or depravity.

Petitioner suggests that because the jury was given options to find grounds for jurisdiction based upon MCL 712A.2(b)(2), the failure to give the requested instruction is harmless. Petitioner's alternative argument is not persuasive. The jury was given a verdict form allowing for a binary choice; it was asked to either find jurisdiction or find no jurisdiction. If this Court were to conclude that a finding of jurisdiction under MCL 712A.2(b)(1) was inappropriate because of the failure to provide the jury instruction at issue, and then go on to conclude that jurisdiction under MCL 712A.2(b)(2) was nevertheless established, the Court would, in essence, be usurping the jury's function. Indeed, it is simply not clear on which subparagraph each juror relied in finding that jurisdiction had been established, and it is not the role of this Court to decide in the first instance whether MCL 712A.2(b)(2) was established. We, therefore, reject petitioner's alternative argument.

If substantial error exists in a jury instruction, and a party is prejudiced by the instructions, the appellate court must grant a new trial. See, e.g., *Camden Fire Ins Co v Kaminski*, 352 Mich 507, 511; 90 NW2d 685, 687 (1958). In *Camden*, our Supreme Court explained:

> "Each party to an action is entitled to have the jury instructed with reference to his theory of the case, where such theory is supported by competent evidence and the instruction is properly requested, and this although such theory may be

controverted by evidence of the opposing party." [*Id*., quoting 53 Am Jur § 626, p 487.]

The Court held that the defendant "was entitled to a clear and unambiguous charge covering substantially his theory of the case as supported by the testimonial picture created by him." *Id*. at 512. Because "[h]e did not get [his requested instruction] or anything like it," the Supreme Court reversed and remanded for a new trial, concluding that the defendant's case "went before the jury without proper instructions." *Id*. Here, respondents' case went before the jury without a clear and unambiguous charge substantially covering their theory of the case. Because they did not get their requested instruction, the case went before the jury without proper instructions, and reversal is required.

## III. AUTOPSY PHOTOGRAPHS

### A. STANDARD OF REVIEW

Respondents contend that the trial court erred by admitting photographs from AP's autopsy. This Court reviews the admission of evidence for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). An abuse of discretion occurs if the decision falls outside the range of principled outcomes. *Id*. at 251-252.

### B. ANALYSIS

"All relevant evidence is admissible" except as otherwise provided by law. MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Respondents contend that the photographs were inadmissible under the balancing test of MRE 403, which states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." The Supreme Court has noted that MRE 403 does not prohibit prejudicial evidence but only prohibits evidence that is unfairly prejudicial. *People v Feezel*, 486 Mich 184, 197; 783 NW2d 67 (2010). This unfairness arises if there is a danger that marginally probative evidence will be given undue weight by the jury. *Id*. The photographs here were not marginally probative. One of the disputes was whether, prior to her death, AP's jaundice improved. The photographs, although taken after her death, depicted the yellowness of her body, her eyes, and her gums. Expert testimony supported that the yellow pigment reflected in the photographs would not have increased after her death. Consequently, the photographs were highly probative as to how yellow she appeared before her death. Photographs that are relevant are not inadmissible merely because they vividly depict shocking details. *People v Head*, 323 Mich App 526, 541; 917 NW2d 752 (2018).

Respondents also claim that the autopsy photographs were cumulative to two photographs taken at the home by police. The police photographs show some yellowness on AP, but the autopsy photographs, because of the way the body is laid out in two of the photographs, show how extensive the yellowness really was throughout the surface of the body. In addition, four of the photographs are close-ups and show that the yellowness had permeated AP's eyes and gums. A doctor testified that he would not expect the yellowness of AP to have changed between death and the time of the autopsy. Moreover, contrary to respondents' argument on appeal, the autopsy

photographs did not show AP's body in a state of decomposition. Nor did they show any incisions made by the medical examiner. Under all these circumstances, it was not outside the range of principled outcomes for the trial court to admit the photographs. *Thorpe*, 504 Mich at 251-252.

## IV. CONCLUSION

The trial court's interpretation of MCL 722.634 was both unconstitutional and inconsistent with the statutory language. By relying on an incorrect interpretation of the law as support for its finding that a rational view of the evidence did not support giving the requested instruction, the trial court necessarily abused its discretion. The phrase "legitimately practicing" requires a parent or guardian to be actually practicing their religious beliefs at the time that they did not provide a child with specified medical treatment. That means that the parent or guardian's reason for not providing treatment cannot be a false or spurious reason. Here, as the record contains substantial evidence showing that respondents actual practice of their religious beliefs was the reason they did not seek medical treatment for AP, a rational view of the evidence supported the jury instruction and the trial court erred by not giving it. Reversal is required. On remand, the trial court shall instruct the jury in accordance with MCL 722.634.[8]

Reversed and remanded for further proceedings. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly

---

[8] Given our resolution, we need not address respondents' unpreserved argument that MCL 722.634 is unconstitutionally vague. Likewise, we decline to address respondents' argument that the trial court erred by finding it was in the children's best interests to terminate their parental rights.